## STATE OF CONNECTICUT v. DOUGLAS SAWYER
### (SC 16972)

Sullivan, C. J., and Borden, Norcott, Katz,
Palmer, Vertefeuille and Zarella, Js.[1]

---

[1] The listing of justices reflects their seniority status as of the date of oral argument.

This case first was argued on January 10, 2005, before five justices of this court. Subsequent to oral argument, however, the court, sua sponte, ordered supplemental briefing and argument before an en banc court on the following additional issues:

(1) "Should this court determine that, in sexual assault cases, prior misconduct evidence admitted under the common scheme exception is also admissible to prove the identity of the defendant as the perpetrator of the assault on the victim? See, e.g., *State* v. *Murrell*, 7 Conn. App. 75, 507 A.2d 1033 (1986); *State* v. *Kulmac*, 230 Conn. 43, 644 A.2d 887 (1994); *State* v. *Merriam*, 264 Conn. 617, 835 A.2d 895 (2003)."

(2) "Should this court reconsider its holdings that, in sexual assault cases, prior sexual misconduct is viewed more liberally than other types of prior misconduct?"

(3) "To what extent, if any, is this court constrained by the Code of Evidence from answering either question 1 or 2 by changing our existing law?"

(4) "What standards should this court adopt for 'harmless error' review of erroneous evidentiary rulings? See, e.g., *State* v. *Hines*, 243 Conn. 796, 709 A.2d 522 (1998); *State* v *Askew*, 245 Conn. 351, 716 A.2d 36 (1998); *State* v. *Gonzalez*, 272 Conn. 515, 864 A.2d 847 (2005); *Kotteakos* v. *United States*, 328 U.S. 750, 66 S. Ct. 1239, 90 L. Ed. 1557 (1946)." Reargument was conducted on November 21, 2005.

With respect to the first two issues, we conclude that prior misconduct evidence admitted under the common plan or scheme exception in sexual assault cases should not be admissible to prove the identity of the defendant as the perpetrator of the assault, and that our holdings in sexual assault cases that prior sexual misconduct is viewed more liberally than other types of prior misconduct should not be disturbed. It is therefore unnecessary to address the third issue. Nevertheless, we acknowledge that, since 2000, the year in which the Connecticut Code of Evidence was adopted, the authority to change the rules of evidence lies with the judges of the Superior Court in the discharge of their rule-making function. Of course, prior to that date, changes to substantive evidentiary rules were accomplished by our courts in the exercise of their common-law authority. To the extent that our evidentiary rules may be deemed to implicate substantive rights, we believe that it is unclear whether those rules properly are the subject of judicial rule making rather than the subject of common-law adjudication. Because that question raises an issue on which we did not request briefing by the parties, however, we leave it for another day. We address the fourth issue in part III of this opinion.

Argued November 21, 2005—officially released August 8, 2006

*Norman A. Pattis,* with whom, on the brief, was *David B. Bachman,* for the appellant (defendant).

*Mitchell S. Brody,* senior assistant state's attorney, with whom, on the brief, were *Scott J. Murphy,* state's attorney, and *Vernon Oliver,* former assistant state's attorney, for the appellee (state).

*Michael Fitzpatrick* and *Richard Emanuel* filed a brief for the Connecticut Criminal Defense Lawyers Association as amicus curiae.

*Gerard A. Smyth,* chief public defender, *Martin Zeldis,* chief of legal services, and *Kent Drager* and *Lauren Weisfeld,* senior assistant public defenders, filed a brief for the office of the chief public defender as amicus curiae.

*Opinion*

ZARELLA, J. The defendant, Douglas Sawyer, appeals, following our grant of certification,[2] from the judgment of the Appellate Court affirming his conviction, rendered after a jury trial, of one count each of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (1), burglary in the first degree in

---

[2] We granted the defendant's petition for certification to appeal limited to the following issues: "1. Did the Appellate Court properly conclude that the trial court properly admitted the uncharged misconduct evidence?

"2. If the answer to question one is 'no,' was the introduction of the evidence harmful?" *State* v. *Sawyer,* 263 Conn. 908, 819 A.2d 842 (2003).

violation of General Statutes § 53a-101 (a) (1), sexual assault in the third degree in violation of General Statutes § 53a-72a (a) (1) (A), sexual assault in the third degree in violation of § 53a-72a (a) (1) (B), threatening in violation of General Statutes (Rev. to 1997) § 53a-62 (a) (1) and reckless endangerment in the first degree in violation of General Statutes § 53a-63 (a). On appeal, the defendant claims that the Appellate Court improperly concluded that (1) the trial court did not abuse its discretion in permitting the state to introduce into evidence certain uncharged misconduct evidence, and (2) even if the trial court improperly permitted the state to introduce the uncharged misconduct evidence, the evidentiary error was harmless. We agree with the defendant and, accordingly, reverse the judgment of the Appellate Court.

The opinion of the Appellate Court sets forth the following relevant facts and procedural history. "On July 15, 1998, the victim, D,[3] lived with her boyfriend, her children and another couple in the town of Plymouth. After D's boyfriend and the other couple left to go shopping, D remained at home to watch her children. Also present in D's residence were [the] children of the defendant.[4] The defendant, who lived across the street from D, observed the children playing in a canoe that was in the backyard. He became upset, began to yell at the children and ordered them to stop playing in the canoe. The defendant went over and then entered D's home, and started to berate her for allowing the children to play [in] the canoe.

[3] In accordance with the policy of protecting the privacy interests of victims of sexual abuse, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

[4] D's sister, C, who was married to the defendant at the time of the assault, testified that she had separated from the defendant on June 9, 2000, and that they had divorced on December 7, 2000. C also testified that during July, 1998, she and the defendant attended weekly counseling sessions to address certain problems in their marriage.

"D went upstairs to watch television, and the defendant, uninvited, subsequently followed her into the living room. D was sitting in a rocking chair, and the defendant stood behind her. He then proceeded to reach under her shirt and grope her breasts. D repeatedly asked him to stop and to leave her alone. She also informed the defendant that she would tell her boyfriend what he had done.

"The defendant then proceeded to unbutton D's jeans and inserted his finger into her vagina. D told him to stop. She attempted to push him off, but was unable to do so due to the defendant's size and superior strength. The defendant took a folding knife out of a sheath that he carried on his belt and opened it, exposing the blade. The defendant told her that he would kill her if she told anyone what had occurred. He then placed the knife blade on D's chest, causing her pain, but did not use enough force to break the skin.

"The defendant and D heard a motor vehicle arrive at the house. It was D's boyfriend and the other couple who lived with D returning from grocery shopping. The defendant folded the knife blade, placed it back in the sheath and left [D's] home.

"D exhibited noticeable changes in her behavior after the July 15, 1998 assault. She became depressed, scared and withdrawn. On August 20, 1998, approximately five weeks after the defendant had assaulted her, D told her boyfriend and others about the sexual assault perpetrated by the defendant. D filed a complaint with the police department, and the defendant subsequently was arrested and charged." *State* v. *Sawyer*, 74 Conn. App. 743, 745–46, 813 A.2d 1073 (2003).

Prior to the start of the trial, the defendant filed a motion in limine to preclude testimony by his former wife, C, who also was D's sister, pertaining to allegations

of uncharged misconduct.[5] During the hearing on the motion, the state argued that C should be allowed to testify under the common plan or scheme and identity exceptions to the evidentiary rule precluding the admission of uncharged misconduct evidence. The state also argued that testimony regarding an incident that had occurred in 1997 in which the defendant, in a fit of anger, used a knife to puncture the tire of his brother-in-law's car should be admitted because it was relevant to prove the defendant's motive and use of weapons to intimidate, to harass and to compel others to comply with his demands. Defense counsel objected to the admission of the uncharged misconduct evidence on the grounds of relevance and its tendency to present the defendant's character and reputation in a negative light. After considering the arguments of the parties, the trial court deferred a ruling on the motion until after the state had made an offer of proof as to the relevancy of the proffered evidence.

In the state's subsequent offer of proof, C testified outside the presence of the jury that, on April 22, 2001, a few months prior to commencement of trial, she and the defendant had a telephone conversation in which the defendant said that he wanted to have sex with her one more time.[6] C further testified that she had told the defendant that she was not interested because they were no longer married and that she did not want any-

---

[5] In his memorandum in support of the motion, the defendant suggested that the proposed testimony would relate to his character and reputation, his collection of knives, two incidents of spousal rape and a statement that he allegedly had made to D's boyfriend that he had sexually assaulted another woman.

[6] Although the alleged telephone call took place nearly three years following the charged offenses, when "evidence is relevant to show a common plan or an unusual technique used to commit a crime, we see no reason to exclude it simply because the acts of the defendant involved occurred subsequent to the crime being tried." (Internal quotation marks omitted.) *State* v. *Ellis*, 270 Conn. 337, 358 n.14, 852 A.2d 676 (2004).

thing more to do with him. The defendant responded by threatening that, if she refused to agree, he would make her life miserable.

The trial court overruled the defendant's objection and determined that the proposed testimony was admissible because D and C were similarly situated. The court noted that both women were (1) unmarried when they were threatened by the defendant, (2) of diminished mental capacity, (3) inferior in strength and intellect to the defendant, (4) accessible to the defendant because he lived in close proximity, and (5) propositioned by the defendant and threatened with harm if they did not submit to his demands.[7]

After the jury returned to the courtroom, C testified that, approximately three months before the start of the trial, she notified the police that the defendant had been harassing her on the telephone and that in one of their conversations he had threatened that if she did not agree to have sex with him he would make her life miserable. Upon her refusal, he further threatened that, if she did not do as he wished, he would tell the person she was dating at the time that she and the defendant were having sex, even though they, in fact, were not. C also testified that the defendant's threats frightened her because he had threatened her in the past and that she had reason to believe that his threats "might come true."

On cross-examination, the defendant admitted that he had told C that he would make her life miserable if she did not agree to have sex with him but denied that she was afraid of him or that his request constituted a threat. Following similar testimony on recross-examination, the state queried the defendant regarding his

---

[7] There is no evidence in the record, however, that the defendant had a prior sexual relationship with D as he did with C.

uncontrollable temper and threats he had made to others.

The state also queried the defendant on cross-examination regarding his collection of knives. The defendant indicated that he had possessed a knife similar to the one that was used to threaten D but that it had been confiscated by the police. Over defense counsel's objection, the court permitted the state to ask the defendant why the knife had been confiscated. The defendant then described an incident in which he had slashed a tire on his brother-in-law's automobile after his brother-in-law failed to comply with the defendant's command to remove the vehicle from the defendant's property. Following this testimony, the state elicited further information from the defendant regarding his threat to slash a second tire if the vehicle was not removed immediately and his subsequent arrest and plea of guilty to the offense.

The defendant's testimony about the tire slashing incident was followed by a series of questions regarding his intimidating persona, the efficacy of his threats, his mordacious temper, his history of medication to control emotional instability, his participation in anger management counseling for more than ten years, his counselor's observation that he was "a ticking time bomb," his fear of losing his temper in court and other threats that he had made to C during their marriage. Defense counsel objected to this line of questioning as irrelevant. On recross-examination, however, the state continued to elicit information from the defendant regarding the threatening telephone call and the tire slashing incident.

During closing arguments, the state asserted that the defendant was attempting to intimidate D when he placed the knife against her chest and ordered her to remain silent about the incident. The state argued that D believed that the defendant would kill her if she

reported the incident because she had been present during the tire slashing incident and understood that the defendant had followed through on his threats in the past. Defense counsel responded that evidence regarding the defendant's emotional instability and the tire slashing incident was not relevant to the issue of the defendant's guilt because the defendant was not in D's home when the crime was committed, D's testimony was not credible and the testimony of the other state's witnesses was conflicting.[8]

When the uncharged misconduct evidence was admitted, defense counsel did not request, and the court did not give, a cautionary instruction to the jury as to the limited purpose for which the evidence should be considered. In its final charge to the jury, however, the court repeatedly instructed that testimony regarding the

---

[8] Defense counsel pointed out numerous inconsistencies and alleged weaknesses in the testimony of D to show that she was not a credible witness. These included D's (1) inability to recall whether the defendant had entered her apartment once or twice on the afternoon of the assault, (2) testimony that she did not know how long the defendant had held a knife to her chest despite her earlier statement to the police that he had threatened her with the knife for five to ten minutes, (3) testimony describing the tattoo on the defendant's left hand, which he used to touch her under her jeans, without mention of the hand's obvious deformity, and (4) report to the police that the assault ended when the defendant heard the sound of D's boyfriend's car, which conflicted with her report to her boyfriend that the assault ended when the defendant heard children approaching from another part of the house.

Defense counsel also noted inconsistencies in the testimony of other witnesses for the state. For example, D's boyfriend testified that he initially believed that the assault took place on July 17 or 18, 1998, even though the police later concluded that the assault took place on July 15, 1998, on the basis of D's report that she was assaulted after her housemates had left to go shopping. D also testified that, following the assault, the defendant exited through the front door of the house whereas the couple living with D testified that they observed the defendant exit through the back door of the house upon their return from shopping. Finally, one of the members of that couple testified that he had learned about the assault on the day that it happened but subsequently testified that he had heard about the assault five weeks later, when D reported the incident to the police, and ultimately acknowledged that he did not know when he first learned about the incident.

threatening telephone call and the tire slashing incident was being admitted solely to establish the existence of intent to commit the charged crimes, the identity[9] of the person who committed the crimes and "the means that might have been useful or necessary for the commission of the crime[s] . . . ."[10]

Thereafter, the jury found the defendant guilty on all counts, and the court rendered judgment sentencing

[9] In their briefs filed with this court, both the defendant and the state assert that the central issue in the case is whether the assault had occurred and that there was no issue relating to the identity of the perpetrator. The trial court nonetheless advised the jury to consider the uncharged misconduct evidence to establish the identity of D's assailant. "In the absence of any indication to the contrary, we presume that the jury followed the court's instruction[s]." (Internal quotation marks omitted.) *State* v. *Alston*, 272 Conn. 432, 446, 862 A.2d 817 (2005).

[10] The court instructed the jury: "Evidence of prior misconduct of the defendant. In this case, the state offered evidence through [C] . . . that . . . after the defendant and she were divorced, the defendant telephoned her and asked her to come . . . have sex with him. When she refused, the defendant allegedly told [C] that, if she did not do what he wanted, he would make her life miserable. Additionally, the state, on cross-examination, elicited testimony from the defendant that, in 1997, he slashed the tires of [his brother-in-law's] car because he would not move it from the defendant's parking spot when the defendant told him to do so.

"The evidence offered by the state of prior acts of misconduct of the defendant is not being admitted to prove the bad character of the defendant or his propensity to commit criminal acts. Such evidence is being admitted solely to show or establish the existence of the intent which is a necessary element of the crime charged, the identity of the person who committed the crime and the defendant's knowledge or possession of the means that might have been useful or necessary for the commission of the crime charged. . . .

"You may consider such evidence if you believe it and further find [that] it logically, rationally and conclusively supports the issues for which it is being offered by the state, but only as it bears . . . on the issues of the existence of the intent which is a necessary element of the crime charged, the identity of the person who committed the crime and the defendant's knowledge or possession of the means that might have been useful or necessary for the commission of the crime charged.

"On the other hand, if you do not believe such evidence, or even if you do, if you find that it does not logically, rationally and conclusively support the issues for which it is being offered by the state, namely, the existence of the intent which is a necessary element of the crime charged, the identity

him to a total effective term of twenty years incarceration, suspended after twelve years, and ten years probation. On appeal to the Appellate Court, the defendant claimed that the trial court had abused its discretion in admitting the uncharged misconduct evidence. *State* v. *Sawyer*, supra, 74 Conn. App. 744–45.

The Appellate Court rejected the defendant's claims and concluded that the trial court had not abused its discretion in admitting the uncharged misconduct evidence. Id., 755. The Appellate Court determined that substantial similarities existed between the charged crimes and the uncharged misconduct evidence that were relevant to the identity of D's assailant. Id., 752. The Appellate Court further concluded that, even if the uncharged misconduct evidence had been admitted improperly, the evidentiary error was harmless.[11] Id., 759–60. This appeal followed.

of the person who committed the crime, and the defendant's knowledge or possession of the means that might have been useful or necessary for the commission of the crime charged, then you may not consider that testimony for any purpose.

"You may not consider evidence of prior misconduct even for the limited purpose of attempting to prove the crimes charged in the information because it may predispose your mind uncritically to believe that the defendant may be guilty of the offenses . . . charged merely because of the alleged prior misconduct. For this reason, you may consider this evidence only on the issues of the existence of the intent which is a necessary element of the crime charged, the identity of the person who committed the crime and the defendant's knowledge or possession of the means that might have been useful or necessary for the commission of the crime charged, and for no other purpose."

[11] We note that, although the defendant claimed in his Appellate Court brief that the trial court improperly had admitted the uncharged misconduct evidence to prove intent, identity or knowledge or possession of the means that might have been useful or necessary for the commission of the crime charged, the only ground for admission that the state contested in its reply to the defendant's brief was that pertaining to identity. It is well established that "[c]laims on appeal that are inadequately briefed are deemed abandoned." (Internal quotation marks omitted.) *State* v. *Clark*, 255 Conn. 268, 281 n.30, 764 A.2d 1251 (2001). We therefore conclude that the state's failure to raise an issue in its Appellate Court brief regarding the defendant's claims relating to the improper admission of the uncharged misconduct evidence to prove intent, knowledge and possession of the means useful or necessary

## I

The defendant first challenges the Appellate Court's conclusion that the trial court did not abuse its discretion in permitting the state to introduce evidence of the threatening telephone call to establish the identity of D's assailant. He claims that the trial court should have excluded this testimony because it bore little or no similarity to the charged crimes. We agree.

"The rules governing the admissibility of evidence of a criminal defendant's prior misconduct are well established.[12] Although evidence of prior unconnected crimes is inadmissible to demonstrate the defendant's bad character or to suggest that the defendant has a propensity for criminal behavior . . . such evidence may be admissible for other purposes, such as to prove knowledge, intent, motive, and common scheme or design, if the trial court determines, in the exercise of judicial discretion, that the probative value of the evidence outweighs its prejudicial tendency. . . . That evidence tends to prove the commission of other crimes by the accused does not render it inadmissible if it is otherwise relevant and material . . . . In determining whether there has been an abuse of discretion, every reasonable presumption should be given in favor of the correctness of the court's ruling. . . . Reversal is required only [when] an abuse of discretion is manifest or [when] injustice appears to have been done." (Cita-

---

for the commission of the charged crimes constitutes a waiver of those claims on appeal.

[12] Subsection (a) of § 4-5 of the Connecticut Code of Evidence provides: "Evidence of other crimes, wrongs or acts of a person is inadmissible to prove the bad character or criminal tendencies of that person."

Subsection (b) of § 4-5 provides: "Evidence of other crimes, wrongs or acts of a person is admissible for purposes other than those specified in subsection (a), such as to prove intent, identity, malice, motive, common plan or scheme, absence of mistake or accident, knowledge, a system of criminal activity, or an element of the crime, or to corroborate crucial prosecution testimony."

tion omitted; internal quotation marks omitted.) *State* v. *Ellis*, 270 Conn. 337, 354–55, 852 A.2d 676 (2004).

"The first threshold for the use of evidence of other crimes or misconduct on the issue of identity is that the methods used be sufficiently unique to warrant a reasonable inference that the person who performed one misdeed also did the other. . . . [I]n proffering [prior misconduct] evidence [t]o prove other like crimes by the accused so nearly identical in method as to earmark them as the handiwork of the accused . . . much more is demanded than the mere repeated commission of crimes of the same class, such as repeated burglaries or thefts. The device used must be so unusual and distinctive as to be like a signature. . . . There should [be no] significant differences in the context and modus operandi of the crimes. . . . In order to determine if this threshold criterion for admissibility has been met, we must examine the proffered evidence and compare it to the charged offenses. . . .

"In comparing the proffered misconduct evidence and the crimes with which the defendant was charged, [t]he fact that some of the similarities between the offenses were legal or relatively common occurrences when standing alone does not . . . negate the uniqueness of the offenses when viewed as a whole. It is the distinctive combination of actions which forms the signature or modus operandi of the crime . . . and it is this criminal logo which justifies the inference that the individual who committed the first offense also committed the second. . . . In other words, [t]he process of construing an inference of [i]dentity . . . usually [consists of] adding together a number of circumstances, each of which by itself might be a feature of many objects, but all of which together make it more probable that they coexist in a single object only. Each additional circumstance reduces the chances of there being more than one object so associated. The

process thus corresponds accurately to the general principle of relevancy." (Citations omitted; internal quotation marks omitted.) *State* v. *Merriam*, 264 Conn. 617, 665–66, 835 A.2d 895 (2003).

In *State* v. *Figueroa*, 235 Conn. 145, 665 A.2d 63 (1995), this court determined that the trial court did not abuse its discretion when it permitted the state to introduce uncharged misconduct evidence to prove the identity of the victim's assailant because "the characteristics of the two assaults were sufficiently distinctive and unique to be 'like a signature' . . . ." Id., 164. A comparison of the two offenses revealed that: "(1) both offenses occurred at night, to lone women; (2) in each instance, the assailant kidnapped the victim and held a knife to her throat; (3) both victims were forced into the passenger seat of their own cars and were warned not to look at the assailant; (4) the assailant drove both of the victims' cars for a considerable period of time; (5) both assaults occurred near a particular barn [in a certain] tobacco field, where the [assailant] had previously worked; (6) in each instance, the assailant attempted to remove the victim's clothes; (7) both assaults involved a demand for oral sex; (8) in each instance, the assailant abandoned an attempt to perform or [a] request for a specific sex act when the victim resisted; (9) each victim described her assailant as [a] Hispanic male with similar features; and (10) both assaults occurred within weeks of each other." Id., 163–64.

The present case is distinguishable from *Figueroa* because there were few, if any, similarities between the charged crimes and the uncharged misconduct evidence. The charged crimes arose from the defendant's direct bodily assault of D followed by a threat at knifepoint to kill her if she revealed the incident to others. The uncharged misconduct evidence consisted of a telephone call in which the defendant threatened C, his

former wife, that if she did not comply with his demand to resume a sexual relationship he would make her life miserable and tell the person she was dating that she and the defendant were having sex. Under the applicable principles of law, a comparison of the charged crimes and the uncharged misconduct evidence offered to prove the identity of the assailant must focus on "the distinctive *combination of actions* which forms the signature or modus operandi of the crime . . . ." (Emphasis added; internal quotation marks omitted.) *State* v. *Merriam,* supra, 264 Conn. 665, quoting *State* v. *Figueroa,* supra, 235 Conn. 164. Accordingly, because there were no significant and compelling similarities between the charged and uncharged offenses and thus no evidence of a distinctive "criminal logo"; (internal quotation marks omitted) *State* v. *Merriam,* supra, 665; we conclude that the trial court abused its discretion in permitting the state to introduce the evidence of the threatening telephone call to establish the identity of D's assailant. See *State* v. *Sierra,* 213 Conn. 422, 431–33, 568 A.2d 448 (1990) (uncharged misconduct evidence inadmissible to establish defendant's identity because incidents not so unusual or distinctive as to be like signature); *State* v. *Ibraimov,* 187 Conn. 348, 352–54, 446 A.2d 382 (1982) (uncharged misconduct evidence inadmissible to establish defendant's identity because shared characteristics of charged and uncharged misconduct insufficiently distinctive to support reasonable belief that same person committed both).

We do not agree with the Appellate Court that "the number of substantial similarities between D and [C] resulted in a distinctive combination that was relevant to the identity of the individual who assaulted D."[13]

[13] According to the Appellate Court, these included the following: (1) "D and [C] were unmarried at the time they were threatened by the defendant; (2) both women previously had been related to the defendant by a marital relationship—[C] was the defendant's former wife . . . and D was his former sister-in-law; (3) both women lived near the defendant; (4) the defendant was superior in strength to D and [C]; (5) the defendant knew that both of

*State* v. *Sawyer*, supra, 74 Conn. App. 751. Although similarities between the victims may contribute to a finding that the characteristics of the charged crime and the uncharged offenses are sufficiently unique to be like a signature; see *State* v. *Figueroa*, supra, 235 Conn. 163 (acts of charged and uncharged misconduct involved lone women); our case law does not support the view that similarities between the victims are the only, or even the most important, factor to be considered. Rather, it is the "distinctive *combination* of factors" that justifies the inference that the individual who committed the first offense also committed the second. (Emphasis added; internal quotation marks omitted.) Id., 164. In the present case, the similarities between D and C, standing alone, were insufficient to satisfy this requirement.

The Appellate Court cited only two similarities between the charged crimes and the uncharged misconduct evidence relating to the manner in which the crimes were committed, namely, the defendant's use of threats to impose his will and his failure to conceal his identity.[14] These similarities, however, are far from unique or distinctive. Criminal defendants typically use threats in the course of committing their misdeeds; see *State* v. *Sierra*, supra, 213 Conn. 431 (use of threats common to crime of armed robbery); and often are known to the victim, particularly in cases of sexual assault. See, e.g., *State* v. *Merriam*, supra, 264 Conn. 658 (defendant had familial or familial-like relationship

the women were mentally handicapped and were supported by supplemental security income as a result of their disabilit[ies]; (6) both women were similar in age; (7) the defendant used threats to impose his will and domination over the women to achieve his goal of sexual gratification; and (8) the defendant made no effort to conceal his identity from the women." *State* v. *Sawyer*, supra, 74 Conn. App. 750.

[14] We note that the trial court did not single out the defendant's failure to conceal his identity as one of the similarities between the charged and uncharged offenses when it decided to allow the state to elicit testimony regarding the threatening telephone call.

with victims of charged and uncharged offenses). Moreover, in threatening D, the defendant held her at knifepoint while expressing a willingness to kill her if she did not remain silent. In contrast, the defendant's threat to C involved the far more ambiguous warning that the defendant would make C's life "miserable" if she did not comply with his demand for sex and was issued over the telephone for the purpose of obtaining sexual gratification in the future. Consequently, the defendant's use of threats and his failure to conceal his identity, in combination with the similarities between D and C, did not constitute a "signature" or a "criminal logo" on which to base an inference that the defendant committed both offenses.

The state alternatively argues that a lesser degree of proof was sufficient to allow the state to introduce evidence regarding the threatening telephone call because a more liberal standard is employed when admitting evidence of other criminal acts to show a common plan or scheme in cases of sexual assault.[15]

[15] Practice Book § 84-11 provides in relevant part: "(a) Upon the granting of certification, the appellee may present for review alternative grounds upon which the judgment may be affirmed provided those grounds were raised and briefed in the appellate court. . . . If such alternative grounds for affirmation . . . were not raised in the appellate court, the party seeking to raise them in the supreme court must move for special permission to do so prior to the filing of that party's brief. Such permission will be granted only in exceptional cases where the interests of justice so require. . . ."

The state did not claim in the Appellate Court that the defendant's misconduct was relevant to prove the existence of a common plan or scheme on the part of the defendant. In its brief to that court, the state claimed that "the defendant's conduct formed a common scheme that was *probative of his identity* as the assailant." (Emphasis added.) Thereafter, the state consistently argued that the trial court properly had admitted common plan or scheme evidence to prove the *identity* of the perpetrator on the basis of his pattern of committing misconduct against individuals to whom he was related by marriage and his failure to conceal his identity from the victims. In the course of its argument, the state cited case law for the proposition that "evidence of a common scheme has been employed to establish *identity*." (Emphasis added.) E.g., *State* v. *Murrell*, 7 Conn. App. 75, 88, 507 A.2d 1033 (1986); cf. *State* v. *Shindell*, 195 Conn. 128, 134–36, 486 A.2d 637 (1985) (defendant's claim that uncharged misconduct evidence did not establish identity of perpetrator must fail because evidence was not

The state argues that the more liberal standard is applicable in the present circumstances because the distinctive characteristics shared by D and C show a "pattern of victim selection" on the part of the defendant that indicates the existence of a common plan or scheme. (Internal quotation marks omitted.) We are not persuaded.

It is well established that "[t]here is a greater liberality . . . in admitting evidence of other criminal acts to show a common scheme, pattern or design in sex-related crimes. . . . Evidence of another sex offense is admissible to show a common scheme or plan if the offense is proximate in time, similar to the offense charged, and committed with persons similar to the prosecuting witness." (Internal quotation marks omitted.) *State* v. *Ellis*, supra, 270 Conn. 355. This principle does not apply when uncharged misconduct evidence is admitted to prove identity because the degree of similarity between the charged crime and the uncharged

admitted to prove identity but to establish broader scheme of criminal activity). In arguing that the probative value of the common scheme evidence outweighed its prejudicial effect, the state further noted that the trial court had concluded that the defendant was presenting a defense of mistaken identity and that, when identity is contested and an alibi defense is presented, "evidence that the assailant in each incident . . . acted in a manner and under circumstances having marked similarities [is] especially probative . . . ." *State* v. *Pollitt*, 205 Conn. 61, 71, 530 A.2d 155 (1987). At no time did the state refer to the more liberal standard for admissibility of uncharged misconduct evidence to prove the existence of a common plan or scheme, nor did it cite the legal standard of review for the admission of uncharged misconduct evidence to prove a common plan or scheme. We thus construe the state's use of the term "common scheme evidence" in its Appellate Court brief to mean prior uncharged misconduct evidence rather than, as the dissenting and concurring justice suggests, evidence used to prove a common plan or scheme.

Although we do not condone the state's failure to request this court's permission, pursuant to Practice Book § 84-11, to raise the alternative ground for affirmance that it now raises on appeal, we nonetheless consider the state's claim because the defendant did not file a reply brief to contest the newly raised claim as prejudicial, and we do not find that the defendant would be prejudiced by our consideration of the issue. See *State* v. *Sinval*, 270 Conn. 516, 529–30 n.11, 853 A.2d 105 (2004).

misconduct in *unrelated* incidents is the key consideration in establishing that the same individual committed both offenses. See *State* v. *Shindell*, 195 Conn. 128, 134–35, 486 A.2d 637 (1985).

In the present case, we conclude that the evidence regarding the threatening telephone call should not have been admitted under the standard applied when prior misconduct evidence is introduced to show a common plan or scheme because it failed to satisfy all three prongs of that standard. Although D and C were similar in several notable respects, there were no other significant similarities between the charged and uncharged offenses. Moreover, the defendant made the threatening telephone call almost three years after he sexually assaulted D. We previously have considered a period of three or more years between charged and uncharged offenses as not too remote in time when the offenses bore "striking similarities"; *State* v. *Morowitz*, 200 Conn. 440, 442–47, 512 A.2d 175 (1986) (defendant podiatrist sexually assaulted victims after asking that they take off outer garments, put on surgical gowns, sit in reclining chair and accept injections of valium that put them to sleep for surgical procedures in his office); or "distinct parallels." *State* v. *Romero*, 269 Conn. 481, 498–500, 849 A.2d 760 (2004) (defendant engaged in pattern of sexual abuse that began with anal intercourse, took place within defendant's home, generally occurred within defendant's locked bedroom when no one else was at home, involved emotional manipulation of victim regarding consequences if abuse was revealed and consisted of separate acts of abuse over period of time). As we previously discussed, there are no "striking similarities" or "distinct parallels" between the charged and uncharged offenses in the present case. Accordingly, a lapse of three years between the charged and uncharged offenses cannot be considered proximate in time. We therefore conclude that the trial court abused

its discretion in permitting the state to introduce evidence of the threatening telephone call.

## II

The defendant next challenges the Appellate Court's conclusion that the evidence relating to the tire slashing incident was admissible to prove the identity of D's assailant. The defendant claims that evidence of the tire slashing incident should not have been admitted because there were no similarities between that uncharged misconduct evidence and the charged crimes. We agree.

Applying the principles set forth in part I of this opinion, we conclude that the tire slashing incident bore no similarity to the charged crimes, and, consequently, the incident is not relevant to the issue of the identity of D's assailant. The charged crime involved a sexual assault. The tire slashing incident involved the destruction of property in the course of an angry confrontation. There simply is nothing about these two entirely different acts that would permit an inference that the person who committed one necessarily committed the other because of a "distinctive combination of actions" so unique as to form a "criminal logo . . . ." (Internal quotation marks omitted.) *State* v. *Merriam,* supra, 264 Conn. 665.

We disagree with the Appellate Court's conclusion that the tire slashing incident and the charged crimes shared several significant characteristics indicative of a criminal logo, including the following: (1) the defendant was related to his brother-in-law and to D as a result of his marriage to C; (2) the defendant made no effort to conceal his identity from either person; (3) the defendant used a knife to ensure compliance and to impose his will over his brother-in-law and D; and (4) both incidents occurred near the defendant's residence. *State* v. *Sawyer,* supra, 74 Conn. App. 757–58. Almost

none of these characteristics relates to the actual misdeeds of the defendant. The only similarity of any consequence is that the defendant used a knife to threaten and intimidate both D and his brother-in-law. The manner in which he used the knife, however, was entirely different. During the sexual assault, the defendant held the knife to D's chest and threatened that he would kill her if she disclosed the incident to others but did not harm her. During the tire slashing incident, the defendant used the knife to puncture the tire on his brother-in-law's vehicle after the brother-in-law failed to comply with the defendant's command that he remove the vehicle from the defendant's property. We thus conclude that the charged and uncharged misconduct did not share a "criminal logo" from which an inference could be drawn that the defendant committed both offenses. (Internal quotation marks omitted.) *State* v. *Merriam,* supra, 264 Conn. 665.

### III

The defendant finally claims that improper admission of the uncharged misconduct evidence resulted in harmful error. We agree.

"When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful. As we recently have noted, we have not been fully consistent in our articulation of the standard for establishing harm. . . . One line of cases states that the defendant must establish that it is more probable than not that the erroneous action of the court affected the result. . . . A second line of cases indicates that the defendant must show that the prejudice resulting from the impropriety was so substantial as to undermine confidence in the fairness of the verdict." (Citations omitted; internal quotation marks omitted.) *State* v. *Young,* 258 Conn. 79,

94–95, 779 A.2d 112 (2001). This inconsistency requires resolution.

It is well established that a defendant must demonstrate harmful error by showing that "it is more probable than not" that the erroneous evidentiary ruling affected the result; (internal quotation marks omitted) *State* v. *Wilkes*, 236 Conn. 176, 188, 671 A.2d 1296 (1996); accord *State* v. *Chapman*, 229 Conn. 529, 544, 643 A.2d 1213 (1994); *State* v. *Payne*, 219 Conn. 93, 103, 591 A.2d 1246 (1991); *State* v. *Sierra*, supra, 213 Conn. 436; *State* v. *Vilalastra*, 207 Conn. 35, 47, 540 A.2d 42 (1988); *State* v. *Artieri*, 206 Conn. 81, 88, 536 A.2d 567 (1988); or that the erroneous evidentiary ruling "would have been likely" to affect the result. (Internal quotation marks omitted.) *State* v. *Ruth*, 181 Conn. 187, 196, 435 A.2d 3 (1980); accord *State* v. *McClain*, 171 Conn. 293, 300, 370 A.2d 928 (1976); *Obermeier* v. *Nielsen*, 158 Conn. 8, 13, 255 A.2d 819 (1969); *Guerrieri* v. *Merrick*, 145 Conn. 432, 435, 143 A.2d 644 (1958).

This court also has declared that erroneous evidentiary rulings will be overturned on appeal only upon a showing by the defendant of substantial prejudice or injustice. E.g., *State* v. *Hines*, 243 Conn. 796, 801, 709 A.2d 522 (1998); *State* v. *Beliveau*, 237 Conn. 576, 592, 678 A.2d 924 (1996); *State* v. *Alvarez*, 216 Conn. 301, 306, 579 A.2d 515 (1990); *State* v. *Hernandez*, 204 Conn. 377, 390, 528 A.2d 794 (1987). In the context of erroneous evidentiary rulings, we have likened "substantial prejudice" to error "so prejudicial as to undermine confidence in the fairness of the verdict." *State* v. *Askew*, 245 Conn. 351, 372, 716 A.2d 36 (1998).

Following *Askew*, we acknowledged both articulations of the standard for establishing harm but made no attempt to address or reconcile their differences. See, e.g., *State* v. *Gonzalez*, 272 Conn. 515, 527, 864 A.2d 847 (2005); *State* v. *Swinton*, 268 Conn. 781, 837

n.54, 847 A.2d 921 (2004); *State* v. *William C.*, 267 Conn. 686, 706 n.20, 841 A.2d 1144 (2004); *State* v. *Kirsch*, 263 Conn. 390, 412 n.16, 820 A.2d 236 (2003); *State* v. *Meehan*, 260 Conn. 372, 397 n.13, 796 A.2d 1191 (2002); *State* v. *Young*, supra, 258 Conn. 95; *State* v. *Grenier*, 257 Conn. 797, 807, 778 A.2d 159 (2001); *State* v. *Malave*, 250 Conn. 722, 741, 737 A.2d 442 (1999), cert. denied, 528 U.S. 1170, 120 S. Ct. 1195, 145 L. Ed. 2d 1099 (2000); *State* v. *Marshall*, 246 Conn. 799, 812, 717 A.2d 1224 (1998); *State* v. *Shabazz*, 246 Conn. 746, 759, 719 A.2d 440 (1998), cert. denied, 525 U.S. 1179, 119 S. Ct. 1116, 143 L. Ed. 2d 111 (1999). Nevertheless, each time we recognized the two lines of cases, we determined that the defendant either had failed; e.g., *State* v. *Gonzalez*, supra, 528 n.9; *State* v. *Swinton*, supra, 837 n.54; *State* v. *Kirsch*, supra, 412 n.16; *State* v. *Young*, supra, 95; *State* v. *Malave*, supra, 741; *State* v. *Shabazz*, supra, 759; or had succeeded; see, e.g., *State* v. *William C.*, supra, 706 n.20; *State* v. *Meehan*, supra, 397 n.13; *State* v. *Grenier*, supra, 807; *State* v. *Marshall*, supra, 812; in satisfying his burden of demonstrating harmful error under *both* articulations of the standard.

We conclude that there is no reason to perpetuate two competing formulations of the standard. Accordingly, we now establish a single workable standard for harmless error review of erroneous evidentiary rulings in the context of criminal cases.

We begin by noting that "[t]he appellate harmless error doctrine is rooted in [the] fundamental purpose of our criminal justice system—to convict the guilty and acquit the innocent. The harmless error doctrine recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence, *United States* v. *Nobles*, 422 U.S. 225, 230 [95 S. Ct. 2160, 45 L. Ed. 2d 141] (1975), and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather

than on the virtually inevitable presence of immaterial error." (Internal quotation marks omitted.) *State* v. *Chapman*, supra, 229 Conn. 544–45.

Historically, harmless error review of nonconstitutional errors in criminal cases required the reviewing court to ask "whether the error had produced a miscarriage of justice as measured by its likely impact upon the outcome of the proceeding." 5 W. LaFave, J. Israel & N. King, Criminal Procedure (2d Ed. 1999) § 27.6 (b), p. 935. Nevertheless, "[f]ew areas of doctrinal development have been marked by greater twisting and turning than the development of standards for *applying* the harmless error rule." (Emphasis added.) Id., pp. 938–39.

In considering the proper standard to be followed by Connecticut courts, it is helpful to examine the standards employed in other jurisdictions. In *Kotteakos* v. *United States*, 328 U.S. 750, 66 S. Ct. 1239, 90 L. Ed. 1557 (1946), the United States Supreme Court determined that "[i]f, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand, except perhaps where the departure is from a constitutional norm or a specific command of Congress. . . . But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand." (Citation omitted.) Id., 764–65.

Several federal circuit courts, including the Second Circuit, have adopted the *Kotteakos* standard. See, e.g.,

*United States* v. *Hornaday*, 392 F.3d 1306, 1316 (11th Cir. 2004), cert. denied, 545 U.S. 1134, 125 S. Ct. 2951, 162 L. Ed. 2d 877 (2005); *United States* v. *Grinage*, 390 F.3d 746, 751 (2d Cir. 2004); *United States* v. *LaHue*, 261 F.3d 993, 1009 (10th Cir. 2001), cert. denied, 534 U.S. 1083, 1084, 122 S. Ct. 819, 151 L. Ed. 2d 701 (2002), and cert. denied sub nom. *Anderson* v. *United States*, 534 U.S. 1083, 122 S. Ct. 818, 151 L. Ed. 2d 701 (2002); *United States* v. *Heater*, 63 F.3d 311, 325 (4th Cir. 1995), cert. denied, 516 U.S. 1083, 116 S. Ct. 796, 133 L. Ed. 2d 744 (1996). Other federal circuit courts have adopted a different formulation of the standard. See, e.g., *United States* v. *Fernandez*, 388 F.3d 1199, 1256 (9th Cir. 2004) (error is harmful "unless it is more probable than not that the error did not materially affect the verdict" [internal quotation marks omitted]); *United States* v. *Clark*, 385 F.3d 609, 619 (6th Cir. 2004) (error is harmless "unless it is more probable than not that the error materially affected the verdict" [internal quotation marks omitted]); *United States* v. *Crenshaw*, 359 F.3d 977, 1004 (8th Cir. 2004) (error is harmless if "the substantial rights of the defendant were unaffected, and . . . the error did not influence or had only a slight influence on the verdict" [internal quotation marks omitted]); *United States* v. *Sutton*, 337 F.3d 792, 797 (7th Cir.) (error is harmful if it had "a substantial and injurious effect or influence on the jury's verdict" [internal quotation marks omitted]), cert. denied, 540 U.S. 1050, 124 S. Ct. 845, 157 L. Ed. 2d 700 (2003), and cert. denied sub nom. *Fleming* v. *United States*, 540 U.S. 1050, 124 S. Ct. 847, 157 L. Ed. 2d 700 (2003), and cert. denied sub nom. *Brown* v. *United States*, 540 U.S. 1051, 124 S. Ct. 846, 157 L. Ed. 2d 700 (2003); *United States* v. *Torres-Galindo*, 206 F.3d 136, 141 (1st Cir. 2000) (error is harmless unless "the improperly admitted evidence likely affected the outcome of [the] trial").

State courts display a similar lack of uniformity. See, e.g., *People* v. *Watson*, 46 Cal. 2d 818, 836, 299 P.2d 243

(1956) (error harmful if "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error"), cert. denied sub nom. *Watson* v. *Teets*, 355 U.S. 846, 78 S. Ct. 70, 2 L. Ed. 2d 55 (1957); *Goodwin* v. *State*, 751 So. 2d 537, 541 (Fla. 1999) (error harmful if "court cannot say beyond a reasonable doubt that the error did not affect the verdict"); *People* v. *Cornell*, 466 Mich. 335, 364, 646 N.W.2d 127 (2002) (error harmful if "it is more probable than not that the error was outcome determinative" [internal quotation marks omitted]); *People* v. *Crimmins*, 36 N.Y.2d 230, 242, 326 N.E.2d 787, 367 N.Y.S.2d 213 (1975) (error harmful if "there is a significant probability, rather than only a rational possibility . . . that the jury would have acquitted the defendant had it not been for the error or errors which occurred").

Our review of these alternative approaches to harmless error review persuades us that the proper standard for determining whether an erroneous evidentiary ruling is harmless should be whether the jury's verdict was substantially swayed by the error. This is consistent with the outcome determinative approach followed by the overwhelming majority of state and federal courts because it expressly requires the reviewing court to consider the effect of the erroneous ruling on the jury's decision. See *Kotteakos* v. *United States*, supra, 328 U.S. 764.

We also adopt the standard expressed in *Kotteakos* and followed by the Second Circuit, namely, "fair assurance"; id., 765; see *United States* v. *Grinage*, supra, 390 F.3d 751; as the appropriate level of confidence for assessing whether the erroneous ruling substantially affected the verdict. Accordingly, we conclude that a nonconstitutional error is harmless when "an appellate court has a fair assurance that the error did not substantially affect the verdict." *United States* v. *Grinage*,

supra, 751, citing *Kotteakos* v. *United States*, supra, 328 U.S. 765.

We now turn to the issue of whether the defendant in the present case has satisfied his burden of proving that the admission of the uncharged misconduct evidence constituted harmful error. "[W]hether [the improper admission of a witness' testimony] is harmless in a particular case depends upon a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the [improperly admitted] evidence on the trier of fact and the result of the trial." (Internal quotation marks omitted.) *State* v. *Gonzalez*, supra, 272 Conn. 527; see also *State* v. *Peeler*, 271 Conn. 338, 385, 857 A.2d 808 (2004), cert. denied, 546 U.S. 845, 126 S. Ct. 94, 163 L. Ed. 2d 110 (2005); *State* v. *Rolon*, 257 Conn. 156, 174, 777 A.2d 604 (2001). Because the present case involves the improper admission of uncharged misconduct evidence, the most relevant factors to be considered are the strength of the state's case and the impact of the improperly admitted evidence on the trier of fact.

We first consider the overall strength of the state's case. The defendant claimed that he had not been present during the commission of the crime. The case thus turned on the jurors' assessment of the respective credibility of the defendant and D. See *State* v. *Sierra*, supra, 213 Conn. 437 (conflicting versions of events requires assessment of parties' credibility). In *State* v. *Ceballos*, 266 Conn. 364, 832 A.2d 14 (2003), we observed that "the absence of conclusive physical evidence of sexual abuse does not automatically render [the state's] case

weak" when the case involves a credibility contest between the victim and the defendant. Id., 416. We also noted, however, that a sexual abuse case lacking physical evidence "is not particularly strong," especially when the victim is a child. (Internal quotation marks omitted.) Id.; see also *State* v. *Alexander*, 254 Conn. 290, 308, 755 A.2d 868 (2000).

In the present case, the state characterized D as mentally challenged. Her timid demeanor on the stand and her inability to comprehend and respond to many of the prosecutor's relatively simple questions without repetition and prompting gave her testimony an unmistakable childlike quality. Accordingly, in the absence of any physical evidence of the defendant's sexual assault of D and in light of the defendant's denial that he had assaulted the victim or even had been present in D's home on the day of the alleged assault, the state did not have a very strong case against the defendant. See *State* v. *Ceballos*, supra, 266 Conn. 416.

The state argued that the defendant could not be believed because D's boyfriend and the other couple living with D testified that, on the afternoon of the alleged assault, they observed the defendant leaving the house when they returned from a trip to go shopping. Defense counsel nonetheless pointed out numerous inconsistencies and weaknesses in the testimony of D, her boyfriend and the other couple living with D to show that they were not credible witnesses. See footnote 8 of this opinion. Furthermore, there was no evidence other than D's testimony that the alleged assault took place, and all of the corroborating witnesses were D's friends.

In view of the fact that the state's case was not particularly strong, we conclude that the admission of the uncharged misconduct evidence was harmful because it suggested that the defendant had a bad character and

a propensity for criminal behavior and thus improperly influenced the deliberations of the jurors. C's testimony regarding the threatening telephone call revealed that the defendant had harassed her on the telephone, had threatened her in the past, had specifically threatened during one telephone call that if she did not have sex with him he would make her life miserable, had frightened and upset her when he made the threat, was a lot bigger and stronger than she was and made her feel "a little nervous" about testifying as a witness against him. Testimony regarding the tire slashing incident also revealed that the defendant had been arrested and pleaded guilty to another offense involving the use of a knife similar to the one allegedly used in the charged crimes, was considered by others to be intimidating, believed that C was "somewhat afraid" of him, did not hesitate to follow through on his threats, had a "very bad" temper, had been attending anger management classes for at least ten years, took medication to control his emotional instability, would "fly off the handle at a heartbeat" if he did not take his medication, had been described by his anger management counselor as a "time bomb ready to go off" and had taken a double dose of medication on the day of his testimony so that he would remain calm on the witness stand.

Furthermore, during closing arguments to the jury, the state repeatedly referred to the defendant's threatening behavior and the tire slashing incident, and suggested that the defendant had intimidated D when he threatened her with the knife. The state further suggested that D was convinced that the defendant would kill her if she did not comply with his demand to remain silent because she had been present during the tire slashing incident and knew that the defendant had followed through on his threats in the past. Accordingly, uncharged misconduct evidence that portrayed the defendant as intimidating, hot-tempered, inclined to

threaten other people and capable of using a knife to back up his threats was unduly prejudicial because it impermissibly suggested that the defendant had a bad character and a propensity for criminal behavior. See *State* v. *Ellis*, supra, 270 Conn. 354. We therefore conclude that the improperly admitted evidence very likely caused the jurors to believe that the defendant was predisposed to commit the offenses for which he was being tried. See *State* v. *Sierra*, supra, 213 Conn. 437 ("[a]ny improper evidence that may have a tendency to excite the passions, awaken the sympathy or influence the judgment of the jury, cannot be considered as harmless" [internal quotation marks omitted]).

We disagree with the Appellate Court's conclusion that admission of the uncharged misconduct evidence did not result in harmful error because the jury heard credible testimony from D regarding the details of the assault, three other witnesses testified that the defendant was at D's home around the time that the sexual assault allegedly occurred, numerous witnesses testified that the defendant regularly carried a knife in a sheath on his belt, the court gave a limiting instruction in its final charge to the jury and the uncharged misconduct evidence paled in comparison to the charged crimes. *State* v. *Sawyer*, supra, 74 Conn. App. 759. These considerations overlook the lack of physical evidence that the assault took place, inconsistencies in the testimony of the state's witnesses, most of whom were D's friends, the defendant's vivid portrayal of the tire slashing incident, the state's extensive cross-examination and recross-examination of the defendant regarding his unstable temperament, which directly followed and was intertwined with testimony regarding both acts of uncharged misconduct, and the fact that the state repeatedly referred to the tire slashing incident during closing arguments, when discussing the defendant's intimidating personality. We therefore conclude that

the defendant has satisfied his burden of proving that the error was not harmless because it cannot be said, with fair assurance, that the error did not substantially affect the verdict. Accordingly, the defendant is entitled to a new trial.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to reverse the judgment of the trial court and to remand the case to that court for a new trial.

In this opinion SULLIVAN, C. J., and NORCOTT, PALMER and VERTEFEUILLE, Js., concurred.

KATZ, J., concurring. I agree with the majority that the trial court improperly permitted the state to introduce evidence regarding the threatening telephone call and the tire slashing incident involving the defendant, Douglas Sawyer, and that the admission of this evidence constituted harmful error. I write separately, however, because, unlike the majority, I would reach the third issue on which we requested supplemental briefing, namely, whether the Connecticut Code of Evidence (Code) constrains this court from reconsidering its holdings in previous sexual assault cases that prior sexual misconduct is viewed more liberally for admissibility than other types of prior misconduct.

At the outset, I note that, were I free to do so, I would favor reconsidering our holding in *State* v. *Kulmac*, 230 Conn. 43, 60–61, 644 A.2d 887 (1994), wherein we held that, in sexual assault cases, prior misconduct evidence may be viewed more liberally.[1] For the reasons set forth in part I of Justice Borden's dissenting and concurring

---

[1] Were we able to reconsider our approach to prior misconduct evidence in sexual assault cases, I would rely on the reasons I articulated in my dissents in *State* v. *Kulmac*, supra, 230 Conn. 86–88, and *State* v. *Merriam*, 264 Conn. 617, 679–87, 835 A.2d 895 (2003), for rejecting a more liberal standard of admissibility.

opinion, however, in which he discusses the genesis and evolution of the Code, the significance of its commentary and the limitations it imposes on our flexibility, I recognize that we are constrained in so doing by the Code, which codified the holding in *Kulmac*. Thus, we are unable to reconsider that holding absent a rule change by the judges of the Superior Court, guided by the evidence code oversight committee.[2]

The majority appears to recognize that, since the adoption of the Code, the authority to change these rules lies solely with the judges of the Superior Court in the exercise of their judicial rule-making function. Nonetheless, the majority questions, but leaves to another day, whether, to the extent that evidentiary rules may "implicate substantive rights," those rules properly may be the subject of such judicial rule making, as opposed to common-law adjudication.[3] In my

[2] On balance, however, I continue to believe, consistent with the vote of the judges when we adopted the Code, that flexibility, although lost to some degree, is sufficiently afforded by both the evidence code oversight committee, which recently has reconvened to recommend changes, and the savings clause under § 1-2 (b) of the Code. See footnote 4 of this concurring opinion (setting forth text of Conn. Code Evid. § 1-2); see also part I of Justice Borden's dissenting and concurring opinion (explaining Code's recognition of need for flexibility in growth and interpretation of rules of evidence).

[3] I assume that the majority does not intend by its question as to evidentiary rules that "implicate substantive rights" to suggest that it is an open question as to whether the judges retained their common-law authority to adjudicate constitutional or other legal challenges to a rule of evidence when they voted to adopt and be bound by the Code. Our case law makes it clear that the judges retain common-law authority to adjudicate such challenges to a rule of evidence, irrespective of whether that rule derives from the Code, the rules of practice or statutes. See, e.g., *Statewide Grievance Committee* v. *Whitney*, 227 Conn. 829, 840–45, 633 A.2d 296 (1993) (discussing defendant's challenge to Practice Book provisions relating to scheduling of mandatory pretrial conferences in criminal matters as unconstitutional under state and federal constitutions but declining to review due to inadequate record), and cases cited therein; *State* v. *James*, 211 Conn. 555, 561–62, 560 A.2d 426 (1989) (recognizing legislature's shared authority with judiciary to enact rules of evidence, but noting court's prior exercise of its authority to declare such legislative rules violative of constitutional principles, such as due pro-

view, for the reasons that follow, the answer to this question is clear and straightforward and we should not suggest otherwise to the trial judges who are charged with the daily application of the Code. The Code governs where it speaks, and the courts' common-law rule-making authority governs either where the Code does not speak or where the Code requires interpretation. See Conn. Code Evid. § 1-2.[4]

The majority's questioning of this judicial rule-making authority appears to be predicated on a distinction in evidentiary rules between those that are substantive in effect and those that are, I assume, merely procedural in effect. I disagree with the majority's foundational premise. This court has stated unequivocally that "[t]he rules of evidence are procedural." *State* v. *Almeda*, 211 Conn. 441, 454, 560 A.2d 389 (1989); see also *Kelehear* v. *Larcon, Inc.*, 22 Conn. App. 384, 391, 577 A.2d 746 (1990) ("[r]ebuttable presumptions fall within the parameters of the rules of evidence . . . and, therefore, are procedural" [citation omitted]). Accordingly,

cess and equal protection); see also General Statutes § 51-14 (a) (recognizing judicial rule-making authority but prescribing that "[s]uch rules shall not abridge, enlarge or modify any substantive right nor the jurisdiction of any of the courts"). The present case, however, raises no such challenge to the Code's rules regarding the admission and use of prior sexual misconduct evidence.

[4] Section 1-2 of the Connecticut Code of Evidence provides: "(a) Purposes of the Code. The purposes of the Code are to adopt Connecticut case law regarding rules of evidence as rules of court and to promote the growth and development of the law of evidence through interpretation of the Code and through judicial rule making to the end that the truth may be ascertained and proceedings justly determined.

"(b) Saving clause. Where the Code does not prescribe a rule governing the admissibility of evidence, the court shall be governed by the principles of the common law as they may be interpreted in the light of reason and experience, except as otherwise required by the constitution of the United States, the constitution of this state, the General Statutes or the Practice Book. The provisions of the Code shall not be construed as precluding any court from recognizing other evidentiary rules not inconsistent with such provisions."

this court has held, for example, that "[a] change in the rules of evidence . . . after an offense, but before the time of trial, that allows the admission of evidence previously inadmissible does not violate the prohibition against ex post facto laws . . . even though it may work to the disadvantage of the accused." (Citations omitted.) *State* v. *Almeda,* supra, 454. Although the substantive, and perhaps dispositive, effect of the application of a procedural rule of evidence in many instances cannot be doubted, that effect does not change the inherent nature of that rule. See id., 453 (concluding that rules of evidence are procedural because they affect which facts can be placed before trier of fact, whereas "[l]aws that change the elements or facts necessary to establish guilt are substantive in nature"); cf. *State* v. *Skakel,* 276 Conn. 633, 680–81, 888 A.2d 985 (2006) (noting that, "[w]hile there is no precise definition of either [substantive or procedural law], it is generally agreed that a substantive law creates, defines and regulates rights while a procedural law prescribes the methods of enforcing such rights or obtaining redress" [internal quotation marks omitted]); *State* v. *Skakel,* supra, 682 (noting that "civil statutes of limitation are presumed to apply retroactively because they do not affect or alter substantive rights").

The fact that our rules of practice also prescribe similar rules on admissibility of evidence that are no more or less substantive in effect than the Code underscores this point. See, e.g., Practice Book § 25-35 (admissibility of recommendation of family relations counselor); Practice Book § 30-9 (admissibility of information allowed at juvenile detention hearing); Practice Book § 40-25 (inadmissibility of withdrawn alibi defense in criminal matters). Indeed, it is telling that, before the judges vote on any proposed changes to the Code, those changes must be reviewed and approved by the rules committee of the Superior Court, the same

body charged with overseeing changes to provisions of the Practice Book. Thus, the Code essentially is an extension of the Practice Book, using the same format, addressing the same type of issues affecting trial court procedure and designed to effectuate the same goals of uniformity and accessibility. See Conn. Code Evid., forward, p. iv (noting that numbering system of code was modified to conform with system of Practice Book); see, e.g., Practice Book §§ 40-46 through 40-57 (setting forth additional requirements for use of deposition otherwise admissible under rules of evidence).

Finally, I question the legal foundation inherent in the majority's suggestion that the judges of the Superior Court could have had the authority to bind the courts as to purely procedural rules of evidence but not as to those procedural rules of evidence having a substantive effect. I am unaware of any body of law that would support such a distinction. Accordingly, I would reach the issue of whether we are constrained by the Code and would conclude that the Code in fact does preclude our reconsideration of our holding in *Kulmac*.

BORDEN, J., dissenting and concurring. As the majority notes; see footnote 1 of the majority opinion; when the court decided to consider this case en banc, we ordered the parties to file supplemental briefs on the following four questions: (1) Should this court determine that, in sexual assault cases, prior misconduct admitted under the common scheme exception is also admissible to prove the identity of the defendant as the perpetrator of the assault on the victim? (2) Should this court reconsider its holdings that, in sexual assault cases, prior sexual misconduct is viewed more liberally than other types of prior misconduct? (3) To what extent, if any, is this court constrained by the Connecticut Code of Evidence (Code) from answering either of the first two questions by changing our existing law? (4)

What standards should this court adopt for "harmless error" of evidentiary rulings in criminal cases?

The majority concludes that, with respect to the first question, "prior misconduct evidence admitted under the common plan or scheme exception in sexual assault cases should not be admissible to prove the identity of the defendant as the perpetrator of the assault" on the victim, and, with respect to the second question, "our holdings in sexual assault cases that prior sexual misconduct is viewed more liberally than other types of prior misconduct should not be disturbed." See footnote 1 of the majority opinion. The majority does not, however, give its reasons for these conclusions, even though both parties have fully briefed both questions, giving their respective reasons.

As for the third question, the majority concludes that, because it has answered the first two questions essentially in the negative, albeit without explanation, "[i]t is . . . unnecessary to address the third issue," namely, whether the Code constrains us in changing any rule of evidentiary admissibility. See footnote 1 of the majority opinion.

In this connection, I agree with that part of Justice Katz' concurring opinion in which she persuasively demonstrates that there is no basis for the majority's implied questioning with respect to any limitation on the authority of the judges of the Superior Court to adopt the Code.[1] I note, first, that neither our questions posed to the parties for supplemental briefing, nor the parties' responses thereto, suggested in any way that the judges lacked any such authority. Indeed, since the Code's adoption as of January 1, 2000, no litigant in this court has raised such a question. Second, for all

[1] I disagree, however, with Justice Katz' suggestion that, were we free to do so, we should reconsider our holding in *State* v. *Kulmac*, 230 Conn. 43, 60, 644 A.2d 887 (1994).

of the reasons stated by Justice Katz in her concurring opinion, the answer to the question is, as she states, "clear and straightforward": the judges adopted the Code in the exercise of their unquestioned rule-making authority, involving matters of procedure, not substance, and there is simply no basis for the implied assertion that the judiciary, acting through the judges of the Superior Court, has any limitation on its authority to adopt a code of evidence.

The majority answers the fourth question by adopting a new standard for the harmless error doctrine as applied to an evidentiary error in a criminal case. The majority explains that new standard in part III of its opinion. As I explain more fully in part V of this dissenting and concurring opinion, I agree with the majority regarding the harmless error doctrine. I disagree, however, with the majority's conclusion that the defendant, Douglas Sawyer, has made the required showing of harmfulness under the newly articulated standard in the present case.

I disagree with the majority's conclusion regarding the first question. Unlike the majority, however, I think it is necessary to give my reasons for that conclusion. I conclude that, not only *should* this court determine that, in sexual assault cases, prior misconduct evidence admitted under the common scheme exception is also admissible to prove the identity of the defendant as the perpetrator of the assault on the victim, but that we have *already* done so, and that common sense and experience compel that conclusion.

I agree with the majority's ultimate conclusion regarding the second question, namely, that we should not reconsider our prior holdings that prior sexual misconduct is viewed more liberally than other types of prior misconduct. Again, unlike the majority, however, I find it necessary to give my reasons for that conclusion,

which are compelled by the proper answer to the third question.

The third question asks: to what extent, if any, are we constrained by the Code from *changing* our existing evidentiary law, as embodied in that Code? In my view, we are so constrained. Put another way, the adoption of the Code by the judges of the Superior Court lodged in those judges, acting as a body, the authority to *change*, as opposed to the authority to *interpret*, the Code. Although this court, as does any court, retains the authority to interpret the Code, it cannot in the course of adjudication change the Code. In this respect, moreover, "the Code" necessarily includes, not only its black letter law, but the preexisting case law, which it was meant to embody at its adoption.

Applying these principles to the present case, I conclude that: (1) we are free to hold, and should explicitly acknowledge, that prior misconduct admitted under the common scheme exception is admissible to prove the identity of the defendant as the perpetrator in the case on trial because to do so would not in any way change the Code; and (2) irrespective of the merits of whether we should reconsider our holdings that prior sexual misconduct is viewed more liberally in sexual assault cases than other types of misconduct, we are constrained by the Code from such reconsideration, because to do so would be to change the Code, which we cannot do. Furthermore, applying these rules of evidence to the facts of the present case, I conclude that the trial court did not abuse its discretion in admitting the telephone call as prior misconduct evidence; and that it did abuse its discretion in admitting the evidence of the tire slashing incident, but that the error was harmless. I would, therefore, affirm the judgment of the Appellate Court. *State* v. *Sawyer*, 74 Conn. App. 743, 813 A.2d 1073 (2003).

# I

## THE CODE

I begin with the third question, namely, the extent to which, if any, we are constrained by the Code from changing our rules regarding the admissibility of evidence. It is clear that we are so constrained. That is a choice that the judges of the Superior Court, including the justices of this court, as well as the judges of the Appellate Court, all of whom are also judges of the Superior Court,[2] made when we adopted the Code.

There is no dispute about the history, rationale, scope and method of adoption of the Code. In 1999, I, as chair of the rules committee of the Superior Court and as the chair of the original drafting committee of the Code, and at the request of the Connecticut Bar Journal, authored a short article explaining those matters. D. Borden, "The New Code of Evidence: A (Very) Brief Introduction and Overview," 73 Conn. B.J. 210 (1999). This article was published after the vote of the judges adopting the Code but before its effective date so that the members of the bar would have the same information regarding the Code that the judges had at its adoption.

That history, rationale and scope are as follows. What began as a cooperative effort among the judiciary, the legislature and the bar, under the aegis of the law revision commission and initially contemplated as a legislative enactment to be followed by a joint judicial and legislative oversight committee; id., 210–11; ultimately became, at the urging of the legislative leaders, a set of judicial rules of court, adopted "pursuant to the rulemaking authority of the Judges," in order to insulate

---

[2] General Statutes § 51-165 provides that the justices of this court, as well as the judges of the Appellate Court, are also judges of the Superior Court. Indeed, all of the justices' commissions explicitly acknowledge our appointments as judges of the Supreme Court and of the Superior Court.

subsequent changes "from the political arena." Id., 211. Consequently, the original draft of the Code was submitted to a committee of judges, who made several changes to it and then submitted it, as revised, to the rules committee. That committee unanimously approved it, held a public hearing on it, and then submitted it for approval at the annual meeting of the judges of the Superior Court on June 28, 1999. Id., 211–12. The judges approved the Code on that day, and it became effective January 1, 2000. Id., 210.

It is undisputed that the Code was intended to codify, and thus to embody, the law of evidence in our state as it existed in our case law at the time of the adoption of the Code. This was made clear by virtue of the language of the Code itself, by its commentary, which the judges explicitly adopted when they adopted the Code, and by my brief article. The rationale for having a code of evidence, as opposed to a body of case law, was clear and straightforward. It was to make it "easier and more efficient for all of the relevant actors in the litigation process—judges and lawyers—to have a code, stated in concise and familiar 'black letter' form, to which to refer. It will be printed in a separate paperback volume, like the new Practice Book format, that every judge will have with him or her on the bench, and each practitioner will be able to bring to court with him or her." Id., 212.

Section 1-2 (a) of the Code, entitled "Purposes of the Code," provides: "The purposes of the Code are to adopt the Connecticut case law regarding rules of evidence as rules of court and to promote the growth and development of the law of evidence through *interpretation* of the Code and through *judicial rule making* to the end that the truth may be ascertained and proceedings justly determined." (Emphasis added.) This language makes clear (1) that the Code adopts the existing case law, (2) that it does so as rules of court, and (3) that

the two methods of growth and development are interpretation of the Code and judicial rule making. Significantly absent from this language is any reference to *change* of the rules of evidence, as embodied in the Code, by this court or any other court.

When the judges adopted the Code, moreover, they took an "unusual step . . . ." D. Borden, supra, 73 Conn. B.J. 213. "Unlike other situations, in which the Judges, when voting on rules, are guided by but do not formally adopt the commentary submitted by the Rules Committee that normally accompanies proposed rule changes, in adopting the Code the Judges formally adopted the Commentary as well. This is the first time that the Judges have done so. Thus, the Code must be read together with its Commentary in order for it to be fully and properly understood." Id.

That commentary makes it equally clear that the Code simply codified our preexisting case law, and that future change, as opposed to interpretation, would have to be by judicial rule making. The commentary to § 1-2 (a) provides: "Because the Code was intended to maintain the status quo, i.e., preserve the common-law rules of evidence as they existed prior to adoption of the Code, its adoption is not intended to modify any prior common-law interpretation of those rules." That same commentary also provides: "Subsection (a) provides a general statement of the purposes of the Code. Case-by-case adjudication is integral to the growth and development of evidentiary law and, thus, future definition of the Code will be effected primarily through interpretation of the Code and through judicial rule making." Conn. Code Evid. § 1-2 (a), commentary.

Moreover, it is undisputed that the black letter law of the Code must be read in connection with the commentary and the cases cited therein, and that those cases are not meant to be exhaustive but to be illustra-

tive of the general rules of evidence that they state. The Code is "a 'code' in the sense of a set of general statements of the rules embodied in the prior case law, without, however, being an attempt to restate every nuance, exception and different application of the rules of evidence expressed in that case law. That is why the Commentary accompanies each section, because that Commentary points to the general case law that the Code attempts to codify.

"This is a very important point: the Code cannot be properly understood without reference to the accompanying Commentary. The Commentary provides the necessary context for the text of the Code, and the text of the Code expresses in general terms the rules of evidence that the cases cited in the Commentary have established. Furthermore, the Commentary is not intended to be exhaustive. Simply because a case is not cited in the Commentary does not mean that it was intended to be excluded. Instead, the cases cited in the Commentary are intended to be representative of the rules of evidence that they establish and that are intended to be captured by the text of the Code." D. Borden, supra, 73 Conn. B.J. 212.

Finally, we, as judges of the Superior Court, did not overlook the issue of flexibility. Instead, we simply opted to provide for it by two different methods: (1) *interpretation* and *application* of the Code are to be by case-by-case adjudication; and (2) *change* of the Code is to be by rule making by the judges of the Superior Court, guided by a newly created body of judges, namely, the evidence code oversight committee.

When the judges adopted the Code, we recognized that "[o]ne of the arguments against having a code of evidence at all is that it decreases the flexibility that is part of the common-law process. Under the common-law process, the courts are able, on a case-by-case basis,

to develop—and to change—the rules of evidence as experience and reason indicate such development and change to be appropriate. That kind of flexibility is, to some degree, lost when the rules of evidence are codified. *With codification, the courts are, in general, confined to interpreting and applying the Code, and changes require action by the codifying entity, in this case, the Judges of the Superior Court.* Two provisions are aimed at the amelioration of this necessary loss of flexibility.

"First, the Code itself has a 'savings clause.' Section 1-2 (b) provides: 'Where the Code does not prescribe a rule governing the admissibility of evidence, the court shall be governed by the principles of the common-law as they may be interpreted in the light of reason and experience, except as otherwise required by the Constitution of the United States, the constitution of this state, the General Statutes or the Practice Book. The provisions of the Code shall not be construed as precluding any court from recognizing other evidentiary rules not inconsistent with such provisions.' This provision is patterned after the analogous provision of the Penal Code. See Connecticut General Statutes § 53a-4. It will provide some degree of flexibility and common law creativity on the part of a court that is confronted with an evidentiary question that is not covered, either explicitly or implicitly, by the Code." (Emphasis added.) D. Borden, supra, 73 Conn. B.J. 215. Thus, this section of the Code provides the courts with our full panoply of traditional powers in interpreting the Code and our full common-law powers in fashioning new rules of evidence for instances that are not covered by the Code either explicitly or implicitly.

"Second, when they adopted the Code, the Judges also created an ongoing Evidence Code Oversight Committee. The stated purpose of the committee is: 'to monitor the operations of the Code of Evidence as it is

implemented in practice, and to make periodic recommendations for revision and clarification to the Rules Committee of the Superior Court.' " Id., 215–16. The evidence code oversight committee, which is composed of judges and practicing attorneys, both private and public, has been fully functioning since its inception in 2000.

From this discussion, the following conclusions could not be more clear. First, the Code has adopted—codified—our law of evidence as it existed in our case law at the time of the Code's adoption. Second, if a matter is covered by the Code, this court cannot change the rule; that function is for the evidence code oversight committee, the rules committee of the Superior Court, and ultimately for the judges of the Superior Court. This court may, of course, as may any court, *interpret* the Code, as applied to any set of facts in a given case.[3] Third, whether a matter is covered by the Code is determined, not only by the black letter language of the Code, but by its commentary and the case law referred to therein. Fourth, the case law referred to in the commentary is meant to be representative, not exhaustive; other case law not in conflict with those cases must also be considered as part of the Code.

Applying these principles to the question of whether this court has the authority to reconsider our prior holdings that, in sexual assault cases, evidence of prior sexual misconduct is viewed more liberally than other types of misconduct, I conclude that we do not have such authority. Section 4-5 of the Code governs the admissibility of "other crimes, wrongs or acts . . . ."[4]

---

[3] In my view, in most cases, as in the present case, the difference between changing and interpreting the Code will be clear. There will, of course, be close questions in that regard, and those will require the exercise of judgment on the part of the court.

[4] Section 4-5, including the commentary of the Code, provides: "(a) Evidence of other crimes, wrongs or acts inadmissible to prove character. Evidence of other crimes, wrongs or acts of a person is inadmissible to prove the bad character or criminal tendencies of that person.

Subsection (a) states the general rule that such evidence "is inadmissible to prove the bad character or criminal

"(b) When evidence of other crimes, wrongs or acts is admissible. Evidence of other crimes, wrongs or acts of a person is admissible for purposes other than those specified in subsection (a), such as to prove intent, identity, malice, motive, common plan or scheme, absence of mistake or accident, knowledge, a system of criminal activity, or an element of the crime, or to corroborate crucial prosecution testimony.

"(c) Specific instances of conduct when character in issue. In cases in which character or a trait of character of a person in relation to a charge, claim or defense is in issue, proof shall be made by evidence of specific instances of the person's conduct.

"COMMENTARY

"(a) Evidence of other crimes, wrongs or acts inadmissible to prove character.

"Subsection (a) is consistent with Connecticut common law. E.g., *State v. Santiago*, 224 Conn. 325, 338, 618 A.2d 32 (1992); *State v. Ibraimov*, 187 Conn. 348, 352, 446 A.2d 332 (1982). Other crimes, wrongs or acts evidence may be admissible for other purposes as specified in subsection (b). Although the issue typically arises in the context of a criminal proceeding; see *State v. McCarthy*, 179 Conn. 1, 22, 425 A.2d 924 (1979); subsection (a)'s exclusion applies in both criminal and civil cases. See, e.g., *Russell v. Dean Witter Reynolds, Inc.*, 200 Conn. 172, 191–92, 510 A.2d 972 (1986).

"(b) When evidence of other crimes, wrongs or acts is admissible.

"Subsection (a) specifically prohibits the use of other crimes, wrongs or acts evidence to prove a person's bad character or criminal tendencies. Subsection (b), however, authorizes the court, in its discretion, to admit other crimes, wrongs or acts evidence for other purposes, such as to prove:

"(1) intent; e.g., *State v. Lizzi*, 199 Conn. 462, 468–69, 508 A.2d 16 (1986);

"(2) identity; e.g., *State v. Pollitt*, 205 Conn. 61, 69, 530 A.2d 155 (1987);

"(3) malice; e.g., *State v. Barlow*, 177 Conn. 391, 393, 418 A.2d 46 (1979);

"(4) motive; e.g., *State v. James*, 211 Conn. 555, 578, 560 A.2d 426 (1989);

"(5) a common plan or scheme; e.g., *State v. Morowitz*, 200 Conn. 440, 442–44, 512 A.2d 175 (1986);

"(6) absence of mistake or accident; e.g., *State v. Tucker*, 181 Conn. 406, 415–16, 435 A.2d 986 (1980);

"(7) knowledge; e.g., *State v. Fredericks*, 149 Conn. 121, 124, 176 A.2d 581 (1961);

"(8) a system of criminal activity; e.g., *State v. Vessichio*, 197 Conn. 644, 664–65, 500 A.2d 1311 (1985), cert. denied, 475 U.S. 1122, 106 S. Ct. 1642, 90 L. Ed. 2d 187 (1986);

"(9) an element of the crime [charged]; e.g., *State v. Jenkins*, 158 Conn. 149, 152–53, 256 A.2d 223 (1969); or

"(10) to corroborate crucial prosecution testimony; e.g., *State v. Mooney*, 218 Conn. 85, 126–27, 588 A.2d 145, cert. denied, 502 U.S. 919, 112 S. Ct. 330, 116 L. Ed. 2d 270 (1991).

"Admissibility of other crimes, wrongs or acts evidence is contingent on satisfying the relevancy standards and balancing test set forth in Sections

tendencies of" the actor. Conn. Code Evid. § 4-5 (a).
Subsection (b), which is at issue in the present case,
provides that such evidence "is admissible for purposes
other than those specified in subsection (a), such as to
prove intent, identity, malice, motive, *common plan or
scheme*, absence of mistake or accident, knowledge, a
system of criminal activity, or an element of the crime,
or to corroborate crucial prosecution testimony."
(Emphasis added.) Id., § 4-5 (b). Although the common
plan or scheme exception is not specifically mentioned
in the commentary, we have firmly established that in
sexual assault cases, we view evidence of prior sexual
misconduct more liberally for purposes of admissibility
than we do other types of misconduct. We first articu-
lated this rule in *State* v. *Hauck*, 172 Conn. 140, 145,
374 A.2d 150 (1976), and have consistently followed it
since. See, e.g., *State* v. *Aaron L.*, 272 Conn. 798, 804–
805, 865 A.2d 1135 (2005); *State* v. *Ellis*, 270 Conn. 337,
355, 852 A.2d 676 (2004); *State* v. *Kulmac*, 230 Conn.
43, 60, 644 A.2d 887 (1994). Thus, it must be considered
as embodied in the Code. Furthermore, to "reconsider"
it would not be to interpret the Code; it would, instead,
be to change the Code. Therefore, we cannot do so.

4-1 and 4-3, respectively. For other crimes, wrongs or acts evidence to be
admissible, the court must determine that the evidence is probative of one
or more of the enumerated purposes for which it is offered, and that its
probative value is not outweighed by its prejudicial effect. E.g., *State* v.
*Figueroa*, 235 Conn. 145, 162, 665 A.2d 63 (1995); *State* v. *Cooper*, 227 Conn.
417, 425–28, 630 A.2d 1043 (1993).

"The purposes enumerated in subsection (b) for which other crimes,
wrongs or acts evidence may be admitted are intended to be illustrative
rather than exhaustive. Neither subsection (a) nor subsection (b) precludes
a court from recognizing other appropriate purposes for which other crimes,
wrongs or acts evidence may be admitted, provided the evidence is not
introduced to prove a person's bad character or criminal tendencies, and
the probative value of its admission is not outweighed by any of the Section
4-3 balancing factors.

"(c) Specific instances of conduct when character in issue.

"Subsection (c) finds support in Connecticut case law. See *State* v.
*Miranda*, 176 Conn. 107, 112, 365 A.2d 104 (1978); *Norton* v. *Warner*, 9
Conn. 172, 174 (1832)."

## II
## COMMON SCHEME EVIDENCE AS
## PROOF OF IDENTITY

The first question that we ordered the parties to brief was whether we should determine that, in sexual assault cases, evidence of prior misconduct admitted under the common scheme exception to the general rule is also admissible to prove the identity of the defendant as the perpetrator of the assault on the victim in the case on trial. As I have already stated, I conclude that we have already explicitly done and said so, and that common sense and experience compel that conclusion.[5]

It is first necessary to clear away some underbrush that has confused our jurisprudence in this area. I agree with the majority that we have traditionally articulated two—among others—separate exceptions to the general rule of inadmissibility of prior misconduct evidence, namely, identity evidence and common scheme evidence. I also agree that our test for the identity evidence is the so-called "logo" or "signature" test; see, e.g., *State* v. *Mooney*, 218 Conn. 85, 131–32, 588 A.2d 145, cert. denied, 502 U.S. 919, 112 S. Ct. 330, 116 L. Ed. 2d 270 (1991); and our test for the common scheme evidence is the three part test articulated by the majority, namely, that the common scheme evidence is not too remote in time, involved similar conduct to the crime charged, and involved similar victims. See, e.g., *State* v. *Romero*, 269 Conn. 481, 498, 849 A.2d 760 (2004). Simply because the two tests are different, however, does not necessarily mean that they both cannot prove the same thing, namely, that the person who committed

---

[5] Indeed, even the defendant in the present case, although maintaining, of course, that the evidence should not have been admitted under the common scheme exception, explicitly conceded at oral argument in this court that evidence that *is* admitted under the common scheme exception may be used to establish the identity of the defendant as the perpetrator of the assault charged.

the prior misconduct also committed the criminal conduct in the case on trial. In fact, both our case law and our common sense demonstrate that common scheme evidence, just like "logo" evidence, necessarily permits the jury to infer that the person who committed the common scheme conduct also committed the crime charged. This is the same as saying, in the language of our question to the parties, that common scheme evidence is admissible to prove the identity of the defendant as the perpetrator of the assault on the victim.

It is also necessary to clear away any confusion about what we are really discussing. Although the defendant in the present case phrased his claims of error in terms of the *admissibility* of the common scheme evidence and although we phrased our questions to the parties in similar terms,[6] the question also involves what the trial court may or should tell the jury about the evidence admitted. As the majority acknowledges, there was no limiting instruction requested or given at the time of the admission of the testimony, but in its final instructions to the jury the court told the jury that it could use the evidence to establish the "identity" of the defendant. Thus, the question in the present case involves, not only the admissibility of the evidence under the common scheme exception, but the use to which that evidence may be put by the jury in its fact-finding function.

With this background in mind, I return to our case law on this question. Both before and after the promulgation of the Code, our case law recognized that evidence admitted under the common scheme exception permits the jury to infer the identity of the defendant as the perpetrator of the assault charged.

---

[6] For example, we asked whether "prior misconduct evidence admitted under the common scheme exception is also admissible to prove the identity of the defendant as the perpetrator of the assault on the victim?" See footnote 1 of the majority opinion.

We first articulated the three part test for admissibility of common scheme evidence in sex crime cases in *State* v. *Hauck*, supra, 172 Conn. 145, stating: "Evidence of another sex offense is admissible to show a common scheme or plan if the offense is proximate in time, similar to the offense charged, and committed with persons similar to the prosecuting witness." (Internal quotation marks omitted.) We also clearly indicated that this evidence could be used by the jury to establish the identity of the defendant as the perpetrator of the crime charged, by ruling that, not only was the evidence in that case properly admitted, but that the trial court, "in its charge to the jury, properly instructed them that the other crimes evidence was to be considered only to show a circumstance, design or innate peculiarity in the two different crimes to *justify the indication that the commission of one would 'tend to directly affect the principal crime*,' and that it was not to show that the defendant was of bad character." (Emphasis added.) Id., 147.

We reiterated the three part test in *State* v. *Esposito*, 192 Conn. 166, 169–70, 471 A.2d 949 (1984), stating: "Evidence of prior sex offenses committed with persons other than the prosecuting witness is admissible to show a common design or plan where the prior offenses (1) are not too remote in time; (2) are similar to the offense charged; and (3) are committed upon persons similar to the prosecuting witness." We further explained the rationale for such admissibility in terms making it quite clear that the common scheme evidence was admitted to prove that the defendant, who committed the common scheme conduct, also committed the crime charged: "When evidence of other offenses is offered to show a common plan or design the marks which the uncharged and the charged offenses have in common must be such that *it may be logically inferred*

*that if the defendant is guilty of one he must be guilty of the other."* (Emphasis added.) Id., 172.

In *State* v. *Kulmac,* supra, 230 Conn. 61–62, we again reiterated the three part test for common scheme evidence, and its tendency to establish the identity of the defendant as the perpetrator of the crime charged: "In this case, the trial court admitted the evidence that the defendant had sexually abused S because of its tendency to prove that the defendant possessed a common scheme to abuse young girls sexually. When evidence of other offenses is offered to show a common plan or design the marks which the uncharged and the charged offenses have in common must be such that it *may be logically inferred that if the defendant is guilty of one he must be guilty of the other. State* v. *Esposito,* supra, 192 Conn. 172. To guide this analysis, we have held that [e]vidence of prior sex offenses committed with persons other than the prosecuting witness is admissible to show a common design or plan where the prior offenses (1) are not too remote in time; (2) are similar to the offense charged; and (3) are committed upon persons similar to the prosecuting witness. Id., 169–70." (Emphasis added; internal quotation marks omitted.)

Finally, subsequent to the promulgation of the Code, we decided *State* v. *Merriam,* 264 Conn. 617, 835 A.2d 895 (2003). In that case, we held that the prior sexual misconduct offered by the state, although not admissible under the identity exception, was admissible under the common scheme exception; but that the trial court abused its discretion in permitting the state to introduce the common scheme evidence for the purpose of "establish[ing] the defendant's identity as the perpetrator of

the sexual assault alleged in [that] case." Id., 665.[7] Nonetheless, we held that the evidentiary error was harmless because the evidence had been properly admitted under the common scheme exception and was relevant to the issue of the defendant as the perpetrator of that assault. Id., 667–68. Although I was part of the *Merriam* panel and joined the opinion in full, I now realize that our two holdings—(1) that the common scheme evidence was *inadmissible* to establish the identity of the defendant as the perpetrator of the sexual assault charged; and (2) that the error was nonetheless harmless because that same evidence was *relevant* to the issue of the defendant as the perpetrator of the sexual crime charged—were in hopeless conflict with each other. Our discussion of the harmlessness of the error makes that conflict evident, and reinforces what we had been saying all along about common scheme evidence, namely, that it does in fact tend to establish the identity of the defendant as the perpetrator of the crime charged in the case on trial.

As a central part of our harmlessness analysis we stated: "[T]he evidence of the defendant's prior misconduct, which tended to establish a common plan or scheme, was relevant to establish that the defendant, and not someone else, had perpetrated the assault of the victim. In essence, therefore, *the prior misconduct evidence was admitted under the common plan or scheme exception to establish circumstantially the identity of the perpetrator.* In such circumstances, and in light of the trial court's instructions emphasizing that the prior misconduct evidence was not to be considered for the purpose of determining whether the defendant

---

[7] Indeed, as far as I can tell, *State* v. *Merriam*, supra, 264 Conn. 667–68, was the first time that this court had held that evidence admitted under the common scheme exception could not also be used by the jury to establish that the defendant was in fact the perpetrator of the crime under consideration.

had a propensity to commit the crimes with which he had been charged, we conclude that the improper admission of that prior misconduct evidence to prove identity was harmless." (Emphasis added.) Id.

It is clear, therefore, that both prior to and subsequent to the promulgation of the Code, our case law has recognized that common scheme evidence tends to prove the identity of the defendant as the perpetrator of the sexual assault on trial. Indeed, it is impossible for me to see how it could be otherwise, as a matter of common sense and common inference. Whenever we admit common scheme evidence in a sexual assault case, under the three part test we have articulated, the inescapable underlying premise of that purpose is that it is relevant because it shows that, because the defendant acted in a generally similar way before, he is likely to have committed the conduct with which he is currently charged. Put another way, admitting such evidence to prove conduct of the defendant amounting to a common scheme or plan, explicitly rests on the fact that the prior misconduct was committed by the same person, namely, the defendant, and that, therefore, because he acted in a certain way before, he is likely to have acted in a certain way in the case at hand. I simply fail to see any other theory of relevance. In addition, this acknowledgment is consistent with the rationale for the more liberal standard of admissibility of prior sexual misconduct as explained in *Merriam.* That rationale rests, in part at least, on the notion that, when human conduct involves sexual misconduct, people tend to act in generally consistent patterns of behavior, and that it is unlikely (although, of course, not impossible) that the same person will be falsely accused by a number of different victims. See id., 670–71.

Thus, we ought to acknowledge what we have been saying, both explicitly and implicitly, namely, that in sexual assault cases, at least, evidence admitted under

the common scheme exception is admissible ultimately to prove the identity of the defendant as the perpetrator of the assault on the victim, D,[8] in the case at hand.[9] What is impermissible is that the prior misconduct evidence be admitted to prove the defendant's general bad character or his general criminal propensities; it is permissible, however, to admit such evidence to establish what logic and human experience suggest is relevant.

Moreover, it is impossible for me to conceive of a rational juror using it for any other purpose. Consider this scenario: the jury is permitted to hear that the defendant committed some prior sexual misconduct, and is told by the court that it is admitted to show a common scheme or plan. What possible relevance could the juror imagine it to have, other than that, because the defendant engaged in similar conduct before, he is likely to have done so in the case at hand? This does not mean, of course, that the juror is required to draw the inference that the state asks him to draw, namely, that because the defendant committed the prior conduct he committed the conduct charged; it simply means that, if the jury believes the prior misconduct evidence, it may draw the suggested inference.

This recognition is not meant, however, to be an open door policy for the admission of any and all prior sexual misconduct evidence. I repeat here what we stated in *Merriam*: "We emphasize, however, that our approach

---

[8] In keeping with our policy to protect the privacy interests of the victims of sexual abuse, we decline to identify the victim or others through whom her identity may be revealed. See General Statutes § 54-86e.

[9] Indeed, the same rationale applies where prior misconduct is admitted, not as common scheme evidence, but to prove motive or intent: the only relevance of the prior misconduct evidence is that, because the *defendant* acted in a particular way on a prior occasion, it is likely that *he* acted as charged in the case at hand. In all such cases, if the jury believes the prior misconduct evidence, it is a permissible inference from that evidence that *he* committed the crime as charged. That is what is known as identity.

does not vest trial courts with carte blanche to allow the state to introduce any prior sexual misconduct evidence against an accused in sex crime cases. Rather, trial courts first must carefully determine whether the prior misconduct evidence sought to be admitted is being offered for a purpose other than to establish the defendant's bad character or criminal tendencies and whether that evidence falls within an exception to the general rule barring admissibility. See Conn. Code Evid. § 4-5 (a) and (b); see also, e.g., *State* v. *George B.*, [258 Conn. 779, 791–92, 785 A.2d 573 (2001)]. Courts then must scrupulously evaluate whether the probative value of such evidence outweighs the prejudicial effect that invariably flows from its admission. See, e.g., *State* v. *George B.*, supra, 793–94; see also Conn. Code Evid. § 4-3." *State* v. *Merriam*, supra, 264 Conn. 671–72.

Inexplicably, the majority simply ignores both this well established case law and the inescapable logic on which it rests. Indeed, the majority does not even offer any explication for its conclusion to the contrary.[10]

---

[10] The closest the majority comes to an explanation for this conclusion is the following passage contained in part I of the majority opinion: "Evidence of another sex offense is admissible to show a common scheme or plan if the offense is proximate in time, similar to the offense charged, and committed with persons similar to the prosecuting witness. . . . This principle does not apply when uncharged misconduct evidence is admitted to prove identity because the degree of similarity between the charged crime and the uncharged misconduct in *unrelated* incidents is the key consideration in establishing that the same individual committed both offenses. See *State* v. *Shindell*, 195 Conn. 128, 134–35, 486 A.2d 637 (1985)." (Citation omitted; emphasis in original; internal quotation marks omitted.)

This is wholly inadequate as an explanation. First, the passage from *Shindell* cited to does no more than repeat the unremarkable proposition that evidence admitted under the separate, identity exception, must be similar enough so as to be like a signature, and that the evidence offered in that case was offered, instead, under the common scheme exception, which in that case was that strand of the common scheme exception for evidence constituting "a continuing system of criminal activity." Id., 135. Second, it neither says nor suggests that, once admitted under the common scheme exception, the evidence may not also form the basis of an inference that, because the defendant committed the prior misconduct he is likely to have committed the present crime. Indeed, precisely because the prior

## III

## THE TELEPHONE CALL EVIDENCE

I now turn to the trial court's ruling on the admissibility of the telephone call evidence under the common scheme exception. I conclude, contrary to the majority, that this ruling was within the trial court's discretion.

It is useful to recount how the trial court handled these evidentiary issues. At the pretrial hearing on the defendant's motion in limine regarding both the telephone call and the tire slashing evidence, the defendant indicated to the court that his theory of defense regarding the crimes charged was that D had fabricated the entire incident, and that, if there was an act committed upon her, he was not the perpetrator because he was not there at the time. He acknowledged that this theory was one of identity: the defendant was not the perpetrator of the crimes charged.

Upon a voir dire on the defendant's motion,[11] C, who was, at the time of the crimes charged, the wife of the defendant and, at the time of the trial, the former wife of the defendant, testified that, although she had graduated from high school, she had attended special classes there, and was "on disability" due to her inability to

misconduct in *Shindell* was evidence of an ongoing system of criminal activity, that was precisely the basis for its relevance. Third, this passage says nothing about the other well established case law demonstrating that common scheme evidence lays the basis for an inference of identity of the defendant as the perpetrator of the sexual assault charged in the case at bar.

This demonstrates the majority's fundamental misunderstanding of the question that we asked of the parties, and that the majority incorrectly answers. The question is not, as the majority assumes, whether the two tests are the same. Of course, they are not. The question is, instead, whether, once evidence is admitted under the common scheme exception, the jury may use it as a basis for an inference that the defendant is the perpetrator of the crime charged. Of course, it may, because that is the only basis for its relevance.

[11] I describe the procedural posture of the tire slashing incident in part IV of this opinion, because it did not arise in the same fashion.

work and receipt of payments from the state department of mental retardation. C also testified that, at the time of the crimes charged, she and the defendant had lived across the street from D. C testified further that, several months prior to the start of the trial, in June, 2001, the defendant, to whom she was no longer married, telephoned her and threatened to make her life "hard and miserable" if she refused to have sexual relations with him. Although C refused to accede to this demand, the stress of the telephone call caused her great anxiety that necessitated her hospitalization. The trial court denied the defendant's motion in limine as to this evidence, finding that both C and D were unmarried at the time of the defendant's relevant conduct and shared a similar mental incapacity,[12] that the defendant's strength and intellect were superior to that of C and D, that C and D both lived in close proximity to the defendant, who thereby had easy access to them, and that both the charged and uncharged misconduct involved threats of harm if C and D did not submit to his sexual demands.[13]

Thereafter, in the jury's presence, C testified that, on April 22, 2001, the defendant had telephoned her and had asked her for sex, and that she had refused. C testified that her refusal had angered the defendant, and he had told her that he would make her life "hard" and "miserable," and that, unless she had sex with him, he would tell her new boyfriend that she was continuing to have sexual relations with him. C also testified that

[12] The corresponding evidence regarding D was as follows. D was mentally disabled, could not read, and could write only her own name. D had failed to graduate high school, despite having been in special classes. D was unable to work and received social security disability payments. Because D was unable to work, she stayed at home caring for her two minor children. D was forty years old at the time of trial, and her sister, C, was one year younger.

[13] The trial court also denied the defendant's motion in limine regarding the tire slashing incident, which I discuss in more detail in part IV of this opinion.

she was afraid of the defendant because he was stronger, older and bigger than she, and that she had reported the incident to the police.

Although the defendant did not request a limiting instruction to the jury when this evidence was admitted, during its final instructions, the court referred to the evidence and specifically charged the jury that the evidence "[had] not [been] admitted to prove the bad character of the defendant or his propensity to commit criminal acts." Instead, the court charged, the evidence was "admitted solely to show or establish the existence of intent which is a necessary element of the crime charged, *the identity of the person who committed the crime*, and the defendant's knowledge or possession of the means that might have been useful or necessary for the commission of the crime charged." (Emphasis added.)

The majority concludes that this evidence was inadmissible under the common scheme exception. The majority, however, misapplies the test for that admissibility and fails to afford the trial court's ruling the broad deference that our case law provides. In this regard, it is well settled that the trial court's ruling must be sustained so long as it does not amount to an abuse of discretion; *State* v. *Romero*, supra, 269 Conn. 497; and that this standard of review is to be viewed through the viewpoint that we are more liberal in admitting prior misconduct evidence in sexual assault cases. Id., 497–98. Furthermore, in applying the three part test, the "inquiry should focus upon each of the three factors, as a single factor will rarely be dispositive." Id., 498.

First, the three year time period was well within the temporal parameters that we previously have sustained. For example, in *State* v. *Romero*, supra, 269 Conn. 498–500, we sustained a nine year time period, and cited with approval our previous cases sustaining time periods of

seven, ten and even more years. Id., 499. Significant to that conclusion was that there were "distinct parallels" in the conduct and the victims. Id., 500. In the present case, although the specific conduct was only similar in certain respects, the defendant's conduct in choosing his victims was distinctly parallel. In this respect, the second and third parts of the test overlap, because the defendant's choice of sexual victims is part and parcel of his sexual misconduct. C and D were sisters of nearly the same age; they both had a family relationship with him—C being his former wife at the time of the telephone call, and D being his former sister-in-law at the time of the offense charged; and they both shared a common mental disability of which he was vividly aware, making both of them singularly vulnerable to him. Furthermore, the three year time period was well within the time period established by prior case law, even in the absence of such distinctly parallel activity. See, e.g., id., 498–500 (nine year time period not too remote). With respect to the second factor, namely, whether the conduct was similar to the charged offense, although there were certainly differences between the two, the trial court's findings of similarity were not an abuse of discretion. Specifically, the elements of, in the prior misconduct, attempted sexual intimidation of a very vulnerable victim, and, in the charged offenses, actual intimidation of and physical threats against a strikingly similar victim for a sexual purpose, were similar enough to come within the trial court's broad discretion. This is particularly true, given the relatively short time period in the first factor, and the strength of the third factor, namely, the striking similarities between the two victims, which I already have discussed in the context of the time period. In addition, the admissibility of the evidence is further supported by the doctrine of greater liberality of the admission of such evidence in sexual assault cases. Finally, I can see no abuse of

discretion in the court's determination that the proba-
tive value of this evidence outweighed its prejudicial
effect.

## IV

## THE TIRE SLASHING EVIDENCE

I turn, next, therefore, to the admissibility of the tire
slashing evidence. I agree with the majority that this
evidence was improperly admitted. I conclude, how-
ever, that its admission was harmless.

This evidence was also the subject of the defendant's
motion in limine described in part III of this opinion.
The trial court had denied the defendant's motion as
to this evidence, on the basis that the threats issued by
the defendant were sufficiently similar to the threats
made against D to be probative of the occurrence of
the offenses charged and, therefore, the identity of the
defendant as the perpetrator, based on his possession
of and wielding of a knife. The court referred to this
evidence in its final instructions to the jury, as indicated
previously, permitting the jury to use this evidence to
find intent, identity, and the defendant's possession of
the means of committing the crimes charge.

This evidence was introduced as follows. The defen-
dant took the stand and testified that he had not commit-
ted the crimes charged. In its cross-examination, the
state asked whether he had owned a folding knife in
1998, which was when the tire slashing incident took
place. The defendant responded in the affirmative. The
state then asked why the knife had been confiscated
and, over the defendant's objection, the court permitted
the state to elicit from the defendant the particulars of
the tire slashing incident.

The state, properly, does not attempt to bring this
evidence under the rubric for admissibility of prior sex-
ual misconduct based on common scheme. Instead, the
state argues that the Appellate Court was correct in

that this evidence was admissible to prove identity as signature or "logo" evidence. *State* v. *Sawyer*, supra, 74 Conn. App. 757–58. The state also argues that, even if improperly admitted under that exception, the admission was harmless.

I agree with the majority that this evidence cannot be regarded reasonably as signature or logo evidence to establish the identity of the defendant as the perpetrator of the crimes charged in the present case. I also agree with the state, however, that the admission of this evidence was harmless.

First, this was not a case, as asserted by the defendant, solely of D's word against that of the defendant. The defendant's theory of defense was that the crimes never happened, and he testified that he had not been present at D's home on the day of the offenses. This testimony was directly contradicted by three witnesses with whom D lived, namely, D's fiancé, William Mercier, and two other persons, Charles Schilling and Holly Schilling. Mercier testified that he had arrived home at approximately 3 p.m. that day and had encountered the defendant in the living room, and that the defendant, who was carrying a folding knife on his hip, told Mercier that he previously had come into the house to yell at D about certain conduct of her children. Holly Schilling testified that she had seen the defendant leave the house that day and had heard the defendant tell Mercier that D should watch her children instead of watching television. Charles Schilling testified that, when he and Holly Schilling arrived, he saw the defendant outside the back door of D's house. Second, there was ample other evidence from numerous witnesses that the defendant regularly carried a knife in a sheath on his belt, and the defendant himself had testified that he had a violent and explosive temper. Thus, the majority's emphasis on evidence of the defendant's intimidating and threatening nature is exaggerated. That nature did not derive

solely from this evidence; it was corroborated by the defendant's own testimony, and by the testimony of others, including that of D and C. Third, although this prior misconduct was somewhat serious in nature, it was not the type of evidence that was likely to arouse the passions or emotions of the jury, and it paled in comparison to the graphic nature of the evidence of the sexual assault on D. Fourth, the court gave a limiting instruction that prohibited the jury from inferring from this evidence a general bad character or criminal propensity on the part of the defendant. Thus, unlike the majority, I have a fair assurance that this evidentiary error did not substantially affect the verdict.

## V

### THE NEW HARMLESS ERROR STANDARD

I agree with the majority's adoption of a new standard for determining whether a nonconstitutional error requires reversal in a criminal case. As I have stated previously in this dissenting and concurring opinion, however, I disagree with the majority's application of the standard to the facts of the present case, and I conclude that any error by the trial court was harmless. I write further to underscore why I think we rightly abandon the prior standard, which required a defendant to establish that it was more probable than not that the error resulted in a guilty verdict.

The "more probable than not" standard suggests that if our appellate minds are in equipoise on the question of the harm caused by a trial error, the error is deemed to be harmless and the defendant has not carried his burden of establishing harm. Although it is, in my view, a close question, I am persuaded that, if the defendant successfully brings our minds to that point of equipoise, then we do not have a fair assurance that the error did not substantially affect the verdict, and the defendant should be granted a new trial. In other words, whether

the error was serious enough to require a new trial should not, in my view, rest on such a finely honed knife's edge. I therefore agree with the majority that the formulation of the harmless error standard by the Second Circuit Court of Appeals in *United States* v. *Grinage*, 390 F.3d 746, 751 (2d Cir. 2004), more aptly captures the essence of that important appellate judgment call.