******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

McDONALD, J., concurring and dissenting. The present case implicates significant questions about the rights of a disabled person when his or her disability requires the appointment of a conservator, as well as an issue of an evidentiary matter. With respect to the question of whether the plaintiff, Mary H. Kortner, had standing to bring an action in her capacity as the conservator of the person of her daughter, Caroline Kendall Kortner (Kendall), for alleged intentional torts committed against Kendall, the majority declines to address that issue in light of the plaintiff's substitution of herself in her capacity as the administratrix of Kendall's estate. With respect to the question of whether conserved persons lack the capacity to consent to sexual relationships as a matter of law, the majority conclusively responds in the negative. In my view, there is a substantial relationship between these two issues. I would conclude that the record demonstrates that the trial court's treatment of Kendall and her participation in this case effectively rendered her a plaintiff in this action, albeit not technically named as such, to satisfy any potential standing concerns as to whether she retained the capacity to bring an action in her own name. Therefore, the impact of the plaintiff's postjudgment substitution, which does not in any way address the concerns raised about the rights of conserved persons, need not be resolved in this case.[1] Consistent with these concerns, I agree with the majority that a conservatorship may be relevant evidence of a conserved person's capacity to consent to engage in intimate relationships, but is not proof in and of itself of a lack of capacity. Indeed, the requirements in the statutory scheme regarding conservatorship emphasize ordering the least restrictive means of intervention necessary while affording conserved persons the greatest amount of independence and self-determination; see General Statutes §§ 45a-644 (k), 45a-650 (*l*) and 45a-656 (b); and acknowledge the wide range of capabilities that conserved persons may have.

I dissent from the majority's opinion, however, because of its resolution of the evidentiary issue. The majority concludes that an exhibit that the jury improperly was permitted to consider undermines our confidence in the verdict such that the plaintiff is entitled to a new trial. It is apparent from the issues in dispute and the other evidence in the case that this exhibit could not have had even the most marginal effect on the jury's deliberations.

I concur with respect to the result reached in part I of the majority opinion, I concur in parts III and IV of the opinion, and I respectfully dissent with respect to part II of the opinion.

I

As the majority indicates, this court sua sponte raised a jurisdictional issue and sought both supplemental briefs from the parties and amicus briefs from groups that have experience in probate matters affecting the disabled. Certain facts in the record gave rise to this question. Specifically, an initial review of the record revealed that: the plaintiff had been appointed conservator over Kendall's person but not her estate; the Probate Court in the District of Stamford had found that Kendall's eating disorders, rather than a broader mental impairment, necessitated the conservatorship; and Kendall evidenced the capacity to testify intelligently and articulately on her own behalf in her deposition and at trial. See footnote 14 of this concurring and dissenting opinion. In addition, the statutory scheme governing conservatorships only expressly confers authority on conservators of the estate to bring an action;[2] compare General Statutes § 45a-655 (a), with General Statutes § 45a-656; and none of the Probate Court orders issuing or continuing Kendall's conservatorship indicated an intent to confer such authority on the plaintiff and/or to divest Kendall of her right to bring an action on her own behalf. This omission seemed particularly significant in the orders continuing the conservatorship after 2007, in light of substantive amendments to the conservatorship scheme in Public Acts 2007, No. 07-116, that would appear to require such findings. See General Statutes (Rev. to 2007) § 45a-650, as amended by Public Acts 2007, No. 07-116, § 16.[3] These facts clearly distinguish this case from others in which conservators have brought an action on behalf of a conserved person. See, e.g., *Pintavalle* v. *Valkanos*, 216 Conn. 412, 581 A.2d 1050 (1990) (action by conservator of estate to recover for personal injuries of conserved person); *Luster* v. *Luster*, 128 Conn. App. 259, 17 A.3d 1068 (2011) (cross complaint for dissolution of marriage by conservators of estate and person on behalf of conserved person with dementia, who was identified in complaint as incompetent).

Therefore, we raised the question of whether the plaintiff had standing to bring this action in her capacity as Kendall's conservator, or whether Kendall retained the capacity to bring the action on her own behalf despite the conservatorship and was the sole proper plaintiff. The majority assumes, arguendo, that Kendall was the sole proper plaintiff, but concludes that such a standing defect would have been cured by the plaintiff's substitution as the administratrix of Kendall's estate. I cannot agree with this approach because it does not respond to the question of Kendall's rights in the prosecution of this action. As the majority properly concludes in part III of its opinion, the mere fact that Kendall was subject to a conservatorship over her person does not render her, as a *legal* matter, incompetent to make all

decisions of a personal nature.

In answering the question this court raised, however, we must be mindful that "[s]tanding is not a technical rule intended to keep aggrieved parties out of court; nor is it a test of substantive rights. Rather it is a practical concept designed to ensure that courts and parties are not vexed by suits brought to vindicate nonjusticiable interests and that judicial decisions which may affect the rights of others are forged in hot controversy, with each view fairly and vigorously represented." (Internal quotation marks omitted.) *Canty* v. *Otto*, 304 Conn. 546, 556, 41 A.3d 280 (2012). Close scrutiny of the record has convinced me that these concerns are satisfied under the particular circumstances of this case. Kendall was treated, for all intents and purposes, as a plaintiff in this case. Kendall was revealed as the real party in interest in the plaintiff's complaint by virtue of the fact that the plaintiff brought the action in her capacity as Kendall's conservator, and was identified as such in the plaintiff's opening statement to the jury. In numerous pretrial filings, the defendant, Craig L. Martise, referred to Kendall as the "plaintiff" in the case. During testimony by the plaintiff's first witness, the court expressly ruled that both the plaintiff *and Kendall* were parties to the case.[4] Kendall testified in support of the claims alleged, manifesting her agreement with the plaintiff's decision to bring an action against the defendant. Indeed, Kendall had ample opportunity in depositions, during examination by the defendant's expert and in her trial testimony to indicate that the action was contrary to her wishes. The totality of the evidence would suggest, to the contrary, that Kendall ratified the plaintiff's action. To entertain the possibility of dismissing the action to protect Kendall's right to bring an action in her own name under these circumstances would not only elevate form over substance, but would deprive Kendall of her day in court in light of her death following judgment. Cf. General Statutes § 52-123 ("[n]o writ, pleading, judgment or any kind of proceeding in court or course of justice shall be abated, suspended, set aside or reversed for any kind of circumstantial errors, mistakes or defects, if the person and the cause may be rightly understood and intended by the court"). Therefore, while the Appellate Court addressed a closely related standing question in *Kawecki* v. *Saas*, 132 Conn. App. 644, 649–50, 33 A.3d 778 (2011), I would leave the resolution of that issue by this court to another day and conclude that, under these unusual circumstances, there is no logical basis to question the trial court's jurisdiction over the action.

## II

Accordingly, I turn to the basis for the majority's conclusion that the plaintiff is entitled to a new trial, namely, that the submission of plaintiff's exhibit 7[5] to the jury was harmful error. This conclusion is predi-

cated on two determinations: (1) the jury improperly was permitted to consider exhibit 7 in its deliberations; part II A of the majority opinion; and (2) the jury actually considered exhibit 7 in a manner and to an extent that this court cannot have a fair assurance that the submission of the exhibit did not affect the verdict. Part II B of the majority opinion. I agree with the first determination, although not the reasoning in support thereof. I cannot concur in the second determination, however, because any full and fair reading of the evidence and the parties' theories of the case conclusively demonstrates that exhibit 7 would have had no impact on the verdict.

## A

I do not take issue with the majority's conclusion that an exhibit must be received into evidence in order for it to be a proper matter for the jury's consideration.[6] Nevertheless, it is impossible to square the facts in this case with any conclusion other than that the plaintiff waived her objection to the submission to the jury of exhibit 7, a letter purportedly written by Kendall to the "XYZ Housing Authority" (housing authority) regarding a housing authority employee, John Jones. The majority concludes otherwise only by ignoring the most significant aspects of the conduct of the plaintiff's counsel and applying the standard for determining whether a constitutional right, rather than evidentiary error, has been waived.

As the trial court's unchallenged findings reflect, the plaintiff marked exhibit 7 as a full exhibit prior to the start of trial.[7] This action followed the court's instruction that the parties should exchange exhibits, that an exhibit could be marked as "full" only if both parties had agreed, and that upon such agreement, exhibits can be marked "as full exhibits and then we don't have to worry about them." The plaintiff's counsel manifested consent to this instruction. After the close of evidence and final instructions to the jury, the court stated to counsel for both parties: "I'd like counsel to, please, go through the exhibits to see whether or not they're in order *to bring to the jury*." (Emphasis added.) The plaintiff's counsel had marked only ten full exhibits during the course of the trial, and repeatedly had an opportunity to review those ten exhibits during the twenty-eight days between the time they were marked as full exhibits and the time the case went to the jury. In fact, as the trial court found, counsel actually reviewed each exhibit in open court at the conclusion of the testimony, evidence, final arguments and jury charge "to confirm they were exhibits to be given to the jury for deliberations." On one of those four occasions, and in response to the court's instruction, the plaintiff's counsel reviewed aloud the exhibits sequentially, specifically noting "7 is the letter." Once his review was completed, counsel stated: "Okay, so the plaintiff's exhibits are okay by me."

The plaintiff acknowledged, both before the trial court and this court, that she and her counsel "must accept some responsibility for the fact that the offending exhibit 7 was submitted to the jury in the first place." Indeed, in oral argument before this court, the plaintiff's counsel stated that "I have to fall on my own sword. I didn't see it and it went into the jury."

The objective import of the conduct and acknowledgments of the plaintiff's counsel is that the plaintiff waived any objection to the submission of this exhibit to the jury. Indeed, the trial court expressly found that the plaintiff had done so, a finding that can be overruled only if clearly erroneous. See *Pereira* v. *State Board of Education*, 304 Conn. 1, 115, 37 A.3d 625 (2012) (*Palmer, J.*, dissenting). Although the defendant later conceded to the trial court that the plaintiff "had offered this document during a successful argument to the court to exclude it from the jury's consideration" and therefore a reasonable inference arises that the plaintiff's counsel had failed to recognize the import of exhibit 7 in connection with the trial court's favorable ruling on her motion in limine to exclude questions regarding Jones,[8] this court has never required a knowing and intelligent waiver of *evidentiary* error. See *State* v. *Harris*, 147 Conn. 589, 598, 164 A.2d 399 (1960) (The defendant could not claim error in the submission of exhibits to the jury when "[h]e made no objection at the time, although his counsel were given full opportunity to check the exhibits before they were sent to the jury, in accordance with the standard practice in Connecticut. . . . [T]here was no error by reason of the failure of the court itself to sort the exhibits and, in the absence of any request from the defendant, to withhold from the jury those concerned only with the counts as to which a verdict in his favor had been directed." [Citations omitted.]). Indeed, one might go so far as to say that the plaintiff induced the error of which she now complains. See *State* v. *Fabricatore*, 281 Conn. 469, 482 n.18, 915 A.2d 872 (2007) (induced error arises when "the party, through conduct, encouraged or prompted the trial court to make the erroneous ruling" [internal quotation marks omitted]). This court has never held that the right to waive evidentiary error is personal to the party such that the party cannot be bound by counsel's actions. Cf. *Monroe* v. *Monroe*, 177 Conn. 173, 181, 413 A.2d 819 ("[i]t is hornbook law that clients generally are bound by the acts of their attorneys"), cert. denied, 444 U.S. 801, 100 S. Ct. 20, 62 L. Ed. 2d 14 (1979). Moreover, I am unaware of any authority that supports the majority's view that the defendant shared the obligation to alert the court to the plaintiff's error.

Nonetheless, I ultimately agree with the majority that the jury improperly was permitted to consider exhibit 7 in its deliberations. As the majority correctly notes, under the proper procedure, the marshal should bring

any question from the jury to the court to be addressed in open court. See Connecticut Civil Jury Instructions (4th Ed. 2008) instruction 2.9-3, available at http://www.jud.ct.gov/JI/civil/part2/2.9-3.htm (last visited May 21, 2014). Significantly, the defendant conceded at oral argument before this court that the plaintiff inadvertently had submitted exhibit 7 to the jury and that he would have agreed to withdraw the exhibit if the jury's question had been brought to the parties' attention. Under these circumstances, it would have been an abuse of discretion for the trial court to permit the jury to consider exhibit 7.

### B

Therefore, we must consider whether the submission of exhibit 7 to the jury was harmful error. I underscore that, in order to obtain a new trial, it is the plaintiff's burden to prove harm, specifically harm sufficient to give this court a fair assurance that "the jury's verdict was substantially swayed by the error." *State* v. *Sawyer*, 279 Conn. 331, 357, 904 A.2d 101 (2006), overruled in part on other grounds by *State* v. *DeJesus*, 288 Conn. 418, 454–55 n.23, 953 A.2d 45 (2008); accord *State* v. *Payne*, 303 Conn. 538, 553, 34 A.3d 370 (2012); *State* v. *Osimanti*, 299 Conn. 1, 18–19, 6 A.3d 790 (2010). To make this determination, "our analysis includes a review of: (1) the relationship of the improper evidence to the central issues in the case, particularly as highlighted by the parties' summations; (2) whether the trial court took any measures, such as corrective instructions, that might mitigate the effect of the evidentiary impropriety; and (3) whether the improperly admitted evidence is merely cumulative of other validly admitted testimony. . . . The overriding question is whether the trial court's improper ruling affected the jury's perception of the remaining evidence." (Citations omitted; internal quotation marks omitted.) *Sullivan* v. *Metro-North Commuter Railroad Co.*, 292 Conn. 150, 162–63, 971 A.2d 676 (2009). A faithful application of these considerations clearly and persuasively demonstrates that the plaintiff has not met this burden.

At the outset, I note that I generally agree with the majority's characterization of exhibit 7, in that, accepting it at face value for what it purports to be, it reflects Kendall's complaint in letter form to the housing authority regarding certain unwanted conduct by a housing authority employee and her statement to that employee expressing her lack of consent to such conduct.[9] The latter is reflected in the phrase "not leaving when I ask him to leave . . . ." The majority further concludes, however, that the submission of exhibit 7 for the jury's consideration requires a new trial because: (1) this information related to a central issue in the case, namely, whether Kendall had the capacity to consent to the acts alleged; (2) the jury could have found that exhibit 7 itself demonstrated that Kendall had the ability

to consent; (3) exhibit 7 was significant evidence of this fact because it was the sole documentary evidence written by Kendall during the period in question; and (4) the jurors' affidavits and questions to the court clerk and court demonstrate that exhibit 7 influenced the jury's decision. I cannot agree with any of these assertions, because they are clearly and directly undermined by the evidence and the theories of the case evidenced in closing argument. Perhaps more important, these assertions fail to explain how or why exhibit 7 would have influenced the jury's perception of the remaining evidence that was considerably more probative of the matters in dispute.

As the majority correctly notes, the principal dispute and the focus of most of the evidence and argument in this case was whether Kendall had the capacity to consent to the "sadomasochistic" acts alleged. Indeed, there was little dispute that most of the acts alleged had occurred. The jury in fact found that all but two of the acts alleged, those further alleging or suggesting the infliction of serious physical pain, had occurred.[10] In closing argument, the plaintiff focused the jury's attention on the question of Kendall's capacity to consent in light of her history and psychological problems, making only a few fleeting suggestions that Kendall had "stopped consenting" in the later stage of her relationship with the defendant. In fact, there was substantial evidence that, although Kendall felt uncomfortable about participating in some of the conduct initiated by the defendant, there was only one situation alleged in which she actually communicated to the defendant that she did not want to engage in the conduct.[11]

The jury's resolution of this central question necessarily turned on the standard by which it gauged Kendall's capacity to consent. Both parties presented expert testimony on this matter—George Chapar, Kendall's treating psychologist, testified for the plaintiff, and Reena Kapoor, a forensic psychiatrist, testified for the defendant. The experts generally agreed as to Kendall's history, medical condition, and psychological diagnoses,[12] but reached different conclusions as to Kendall's capacity to consent to sexual relations largely because of their application of different standards for assessing capacity. A fundamental difference in those standards was that Chapar opined that capacity required a person to actually make sound choices to protect himself/herself physically and emotionally, whereas Kapoor opined that capacity required a person to have the ability to consider the risks involved, not to actually make the best or safest choices. Consistent with their different standards, the parties pointed to different evidence as probative of Kendall's capacity. In concluding that Kendall had failed to make such sound choices, Chapar pointed to Kendall's dangerous behavior in connection with her eating disorders. The plaintiff's counsel went further and argued to the jury that the fact that Kendall

was under a conservatorship in and of itself demonstrated that she lacked the capacity to consent. In concluding that Kendall had the requisite capacity because of her ability to consider risk, Kapoor pointed to, inter alia, Kendall's incremental development of her relationship with the defendant, in that she had agreed to meet the defendant in person only after an extended period of online communication and had agreed to engage in sexual relations only after she gained a sense of trust in him as their friendship evolved. Kapoor opined that Kendall's conservatorship demonstrated that she lacked the capacity to make decisions about her medical care, but not necessarily her competence to consent to sexual relations. Accordingly, a paramount factor in the jury's determination as to whether Kendall had the capacity to consent would have been which expert the jury credited or whether the conservatorship was dispositive. Exhibit 7 had no bearing on the credibility of these witnesses, the standards they articulated, the parameters for conservatorship or whether some other standard for assessing capacity should apply.

Not only is exhibit 7 irrelevant to these questions, it is irrelevant to the question of whether Kendall would have consented, or was capable of consenting, to engage in the acts alleged with the defendant.[13] As previously indicated, the evidence demonstrated that Kendall's relationship with the defendant developed slowly over a period of several years, from friendship to one that she viewed, at the time, as romantic. They shared intimate details about their lives; they took day trips and an overnight trip together. Kendall indicated to both the plaintiff and Kapoor that she sometimes had engaged in acts with the defendant that she did not feel comfortable about because she did not want him to terminate the relationship. By contrast, nothing in exhibit 7 suggests any personal relationship between Kendall and the housing authority employee who is the subject of the complaint. Therefore, whether Kendall told a person with whom she had no personal relationship to leave her apartment when she felt uncomfortable by his presence or actions would have little if any bearing on whether she would have consented, or was capable of consenting, to the acts alleged with someone with whom she had developed an intimate relationship.

Indeed, exhibit 7 lends some support to the plaintiff's case and is consistent with Kendall's own testimony. Kendall's testimony, like the contents of exhibit 7, reflected a person who was bright and articulate.[14] Exhibit 7 reflects that it took two years of unwanted and egregious overtures before Kendall reported the conduct, which supports the plaintiff's view that Kendall lacked the skills to protect herself from sexual predators. Exhibit 7 does not indicate that Kendall responded directly to Jones when he engaged in "unwanted and inappropriate sexual behavior," but rather that, in connection with certain "threatening

behavior," he did not leave her apartment when she asked him to. It is unclear from exhibit 7 whether Kendall made this rather passive response once or on more than one occasion when the threatening conduct occurred. Similarly, in the present case, Kendall testified that only in some circumstances did she express her lack of consent to the defendant's overtures. See footnote 11 of this concurring and dissenting opinion. In addition, Kendall's threat in exhibit 7 to take legal action after two years of unwanted advances is consistent with the action brought in the present case.

Finally, there is no evidence that remotely would suggest that the jury did consider, or would have considered, exhibit 7 in its deliberations. Obviously, exhibit 7 was not even mentioned, let alone highlighted, in closing argument. The affidavits and questions of certain jurors only demonstrate that the jurors were "confused" by the submission of exhibit 7 because there was no mention of it during trial. The jurors not only had not been provided with any context for the letter in exhibit 7, such context was not self-evident. Indeed, at oral argument before this court, the plaintiff's counsel represented that, in his meeting with the jurors after the verdict had been entered, they indicated about exhibit 7 that "they didn't understand it, they didn't know what it was or why it was before them, and they used the word context—'we had no context for it.'" In light of the substantial evidence that was before the jury that was directly relevant to the issues in the case, it seems most likely that the jury would have focused on that evidence and simply disregarded a document lacking any context. Moreover, even if it did consider exhibit 7, in light of the substantial probative evidence previously discussed, the marginal (at best) relevance of exhibit 7 to the issues at hand, and the consistency between exhibit 7 and the plaintiff's own case, exhibit 7 could not possibly have "substantially swayed" the jury's verdict. See *State* v. *Sawyer*, supra, 279 Conn. 357. Indeed, I would go so far as to conclude that the plaintiff has not demonstrated that exhibit 7 would have had *any* impact on the verdict. Therefore, the trial court properly denied the plaintiff's motion to set aside the verdict and for a new trial.

I respectfully concur and dissent.

[1] I would point out, however, that, if the substitution was properly granted, it is only because of the filing of the plaintiff's motion to set aside the verdict and for a new trial. That motion, which was filed after the trial court rendered judgment, was pending at the time she filed the motion for substitution. Therefore, the motion to set aside the verdict effectively suspended the judgment. See *State* v. *Asherman*, 180 Conn. 141, 144, 429 A.2d 810 (1980) ("a motion for a new trial is filed in a case then in progress or pending and is merely a gradation in that case leading to a final judgment"); cf. *Nelson* v. *Dettmer*, 305 Conn. 654, 681, 46 A.3d 916 (2012) ("the motion to reargue, if granted, would have rendered the summary judgment ineffective, thereby redetermining the rights and obligations of the parties"). In the absence of such a pending dispositive motion, the plaintiff could not have cured a jurisdictionally defective judgment after the fact. See *Serrani* v. *Board of Ethics*, 225 Conn. 305, 309, 622 A.2d 1009 (1993) ("[t]he lack of subject matter jurisdiction to render a final judgment cannot be cured retrospectively"); see

also *Investment Associates* v. *Summit Associates, Inc.*, 309 Conn. 840, 853, 74 A.3d 1192 (2013) (judgment rendered without jurisdiction is "void ab initio").

[2] This court has recognized, however, that "[a] conservator has only such powers as are expressly *or impliedly* given to him by statute." (Emphasis added; internal quotation marks omitted.) *Gross* v. *Rell*, 304 Conn. 234, 291, 40 A.3d 240 (2012) (*McLachlan, J.*, dissenting).

[3] General Statutes (Rev. to 2007) § 45a-650, as amended by Public Acts 2007, No. 07-116, § 16, provides in relevant part: "(k) *A conserved person shall retain all rights and authority not expressly assigned to the conservator.*

"(*l*) The court shall assign to a conservator appointed under this section only the duties and authority that are the least restrictive means of intervention necessary to meet the needs of the conserved person. The court shall find by clear and convincing evidence that such duties and authority restrict the decision-making authority of the conserved person only to the extent necessary to provide for the personal needs or property management of the conserved person. Such personal needs and property management shall be provided in a manner appropriate to the conserved person. *The court shall make a finding of the clear and convincing evidence that supports the need for each duty and authority assigned to the conservator.*

"(m) *Nothing in this chapter shall impair, limit or diminish a conserved person's right to retain an attorney to represent such person or to seek redress of grievances in any court* or administrative agency, including proceedings in the nature of habeas corpus arising out of any limitations imposed on the conserved person by court action taken under this chapter, chapter 319i, chapter 319j or section 45a-242. In any other proceeding in which the conservator has retained counsel for the conserved person, the conserved person may request the Court of Probate to direct the conservator to substitute an attorney chosen by the conserved person." (Emphasis added.)

Even before the enactment of these provisions in 2007, there were some similar limitations. See General Statutes (Rev. to 1997) § 17a-541 ("No patient hospitalized or treated in any public or private facility for the treatment of persons with psychiatric disabilities shall be deprived of any personal, property or civil rights, including the right to vote, hold or convey property, and contract, except in accordance with due process of law, and unless such patient has been declared incapable pursuant to sections 45a-644 to 45a-662, inclusive. *Any finding of incapability shall specifically state which civil or personal rights the patient is incapable of exercising.*" [Emphasis added.]).

[4] The following exchange occurred on the first day of trial during direct examination of the plaintiff by her counsel in response to objections by the defendant's counsel:

"[The Plaintiff's Counsel]: Did Kendall ever tell you what happened to her that fall at the University of North Carolina?

"[The Plaintiff]: She has since.

"[The Defendant's Counsel]: Objection.

"The Court: Overruled.

"[The Plaintiff's Counsel]: Kendall ever tell you what happened to her?

"[The Plaintiff]: Yes, but—

"[The Plaintiff's Counsel]: What did she tell you?

"[The Defendant's Counsel]: Objection.

"The Court: Basis?

"[The Defendant's Counsel]: Hearsay.

"The Court: She's—isn't she the conservator? Overruled. You can answer."

The following exchange between the plaintiff's counsel and the defendant's counsel occurred one day later when direct examination of the plaintiff continued:

"[The Plaintiff's Counsel]: Right. Okay. And in that conversation, what did [Kendall] tell you about washing herself with Chlorox?

"[The Defendant's Counsel]: Objection.

"The Court: Basis.

"[The Defendant's Counsel]: Hearsay.

"The Court: She's a party, isn't she? Why is it hearsay?

"[The Defendant's Counsel]: I don't know if she's a party. This is the party on the witness stand.

"The Court: Okay. She's a party to this case. I overrule the objection.

"[The Defendant's Counsel]: Are they both parties, Your Honor?

"The Court: Well, she's a conservator and I would assume that . . . Kendall—and I think they are both parties, if I looked at the—

"[The Defendant's Counsel]: Well, the declarant. What I'm asking is, is the declarant a party? I don't know the answer. I think the answer is in the negative.

"The Court: I'm going to allow it. I would—I'm going to allow it. I'm going to say it's not hearsay. She may testify. Go right ahead."

The defendant made no further objections and did not raise this issue on appeal.

[5] See part II of the majority opinion for the text of exhibit 7.

[6] I am not persuaded, however, that either Practice Book § 5-7 or the trial management order cited by the majority resolves the question of whether a document marked as a full exhibit *by agreement of both parties* requires some further action in order to allow it to be submitted for the jury's consideration. Moreover, it is not clear from the majority's opinion what further action is required in order to allow that consideration. In the absence of any restrictions or specified procedures in our rules of practice, I would conclude that, when the parties have agreed to mark an exhibit in full, barring evidence to the contrary, such an action manifests a waiver of any obstacles to the introduction of that exhibit into evidence, including its use, relevance, foundation and authenticity. Cf. *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Cole*, 189 Conn. 518, 525, 457 A.2d 656 (1983) ("[a]n exhibit offered and received as a full exhibit is in the case for all purposes"). Moreover, I would conclude that it is sufficient for a party simply to state in the presence of the trier of fact (court or jury) that the exhibit is a full exhibit by agreement of the parties, and that there is no further requirement that the proponent of the exhibit must introduce it through a witness. A contrary rule would undermine much of the economies gained in premarking exhibits by agreement. Of course, either party would be free to use the exhibit for any purpose and, even if the proffering party declined to introduce the exhibit through a witness, the opposing party would be free to use it in the course of its examination of witnesses.

[7] Indeed, the plaintiff first demonstrated her intent to introduce exhibit 7 as a plaintiff's exhibit on November 5, 2009, when she listed it as one of her exhibits in her pretrial memorandum. More than two weeks later, on November 20, 2009, the plaintiff marked exhibit 7 as a full exhibit.

[8] Although prior to trial, the trial court reserved decision on the motion in limine as to questions regarding Jones, it effectively granted the motion as to that matter subsequently during trial when it denied the defendant's request to examine witnesses on this subject for various reasons, including relevance, foundation and prejudice.

[9] As the majority notes, the plaintiff asserts on appeal that the defendant authored the letter contained in exhibit 7. It is possible, however, that jurors reached this conclusion on their own in light of the facts that the letter is typed and unsigned, the addressee, "XYZ Housing Authority," looks like the name of a fictitious entity, Kendall and the plaintiff referred in their testimony to the apartment complex where Kendall lived under a different name— Stamford Green, and the defendant was forced to concede in his testimony that he had fabricated an exhibit that his attorney earlier proffered on behalf of the defendant's case as well as certain testimony. Moreover, the jurors' affidavits specifically characterized the letter in exhibit 7 as one that "appeared to be from Kendall Kortner" or "appeared to be written by Kendall Kortner." Nonetheless, I would not rely on such speculation in determining whether the jury could have relied on this evidence in reaching its verdict.

[10] The interrogatories submitted to the jury asked whether the defendant had: (a) "slapped [Kendall's] buttocks with both his hand and a leather belt during intercourse"; (b) "dressed Kendall in a crotchless black body stocking and a cat's mask"; (c) "repeatedly showed Kendall pornographic pictures and videos"; (d) "pinched and twisted Kendall's nipples and applied 'nipple clamps' and other devices *which caused her severe pain and discomfort*"; (e) "tied and gagged Kendall with a scarf"; (f) "dripped burning wax on Kendall's breasts and other parts of her body"; and (g) "placed a dog collar on Kendall's *neck and dragged her around on the floor by a leash*." (Emphasis added.) The jury found that the defendant had committed all of these acts except (d) and (g).

[11] Kendall testified that sometimes she had told the defendant "no" or used the safe word that he had given her shortly after they commenced the sexual relationship to indicate that she did not want to engage in the conduct. She could not recall how often she expressed this or whether he had listened to her. There was evidence that Kendall reported to others that the defendant had stopped the activity when requested, or stopped on all but one occasion. Timothy Dolan, a Stamford police officer, interviewed Kendall two months

after Kendall revealed to the plaintiff the full nature of her relationship with the defendant. Dolan testified that Kendall had told him that she had not resisted the defendant's advances except on one occasion, when he put a dog collar and leash on her and tried to get her to walk on all fours, but when she could not do that he dragged her on the floor. Dolan further testified that Kendall had said that the defendant told her to tell him if he did anything that bothered her and that he would stop. The defendant's expert, Reena Kapoor, who interviewed Kendall for seven hours over a period of two days, testified that Kendall had indicated that there were times that she had asked the defendant to stop or said no, and that the defendant stopped. Kapoor further stated that Kendall sometimes felt that she could not say no because she was afraid that, if she said no, the defendant would leave her. The defendant testified that the only time Kendall had objected to their interactions was when he had put the dog collar and leash on her and proposed to walk her like a dog. He further testified that they did not continue and that the collar was removed.

[12] The experts did disagree, however, whether Kendall's history and conditions resulted in developmental arrest of her emotional and psychological capacity at a preadolescent stage as to *every* aspect of her life or only as to *certain* aspects of her life.

[13] Consent and capacity to consent are distinct issues. Thus, evidence that a person has acquiesced to certain conduct might demonstrate consent but not necessarily capacity to consent. Indeed, that is the plaintiff's theory in the present case. Conversely, however, evidence that a person has expressed that he or she does not consent to engage in certain conduct would be relevant evidence of that person's capacity to consent.

[14] For example, Kendall testified: "I have no faith in anything—I mean as far as God, I mean, you know whether it be God or Allah or the teachings of Confucius. I mean everybody wants to know that we all agree that we're physical beings and we have minds, but what is our essence? What survives our bodily death? And I don't know and I don't have any faith. I can't make sense of anything. I just—never trust anybody."